ELLEN F. GREENE, administratrix, vs. BOSTON ELEVATED
RAILWAY COMPANY.

Suffolk.    November 10, 1910. — January 6, 1911.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Negligence,* Employer's liability.  *Evidence,* Presumptions and burden of proof,
Opinion: experts.   *Witness,* Examination.

In an action of tort against a corporation operating an elevated railway, by the administrator of the estate of a lineman in its employ, for the conscious suffering and death of the plaintiff's intestate, alleged to have been caused by a defect in a splice in a feed cable of the defendant with which a monkey wrench that the plaintiff's intestate was using came in contact and created a short circuit of electricity, there was evidence, elicited upon the cross-examination of one of the plaintiff's witnesses, which strongly tended to show that the cable containing the splice alleged to have been defective was so high above the nut on the end of the bolt of a dog clamp, which the plaintiff was grasping with the monkey wrench, that the wrench could not have come in contact with that cable and must have struck a lower cable, which was not shown to have been defective. It had to be admitted that the lower cable burned through and parted, while the spliced cable although burned did not drop, that the iron of the monkey wrench back of the jaws was in part melted, and that the top of the clamp was melted, facts which made it hard to believe that it was the spliced cable with which the wrench came in contact. But the physician, who attended the plaintiff's intestate, testified that the intestate told him that the monkey wrench hit the spliced cable, and that the matter with the cable which he hit with the monkey wrench was "that it was a new splice at that point," and there was no splice in the lower cable.  *Held,* that in this conflict of testimony it was for the jury to decide what the fact was, and that the case properly was left to the jury.

In an action, by the administrator of the estate of a lineman against his employer, for the conscious suffering and death of the plaintiff's intestate alleged to have been caused by a defect in a splice of a feed cable of the defendant, which when it came in contact with the end of a monkey wrench that the intestate was using created a short circuit of electricity, there was evidence that the defective splice was wound about with tape and then painted, and a witness, called by the plaintiff as an expert, was allowed to be questioned and to answer as follows: Q. "Whether or not after the tape was put in, and before the tape was painted, whether or not an inspection of the joint would disclose the opening which you have indicated, if it was there?  After the paint was on, will you tell me as to whether or not inspection would tell?  A. No, it would all be smooth, slicked over by the paint. — Q. I want to ask you, on a metal joint what danger, if any, there would be in a workman having one end of that monkey wrench attached to a nut, and touching with the other end of the monkey wrench a joint which was taped properly — which was taped as you have described as the usual method of taping a joint, what danger there would be of short circuiting?  A. I should say it would not short circuit under those circumstances. — Q. Whether or not, doing that under such conditions would be a safe thing for a workman to do?  A. I

should think it would be safe, yes." The defendant, in support of its exception to the admission of this evidence, contended that it related to matters of common knowledge which were not the proper subjects of expert testimony. *Held,* that none of these questions was objectionable as relating to matters of common knowledge, but that, if the answers contained matters of common knowledge, they did the defendant no harm because they were right, and that the jury were entitled to consider the facts stated in them whether such facts were matters of common knowledge or were imparted by the witness.

Certain questions, allowed by a presiding judge in the exercise of his discretion to be put to an expert, here were held not to violate the rules that the assumptions of fact upon which the opinion of an expert is asked and based should be reasonably clear, and that where certain facts are agreed and are obviously necessary as a premise to the formation of any instructive opinion upon the subject of inquiry, the question put to the expert should include such facts or at least should not be inconsistent with them.

If a presiding judge thinks that the jury will get more help upon a matter which is the subject of expert testimony, if an expert is allowed to give his opinion upon separate matters than they would if he were required to answer a hypothetical question reciting all the facts in the case, it is within the discretion of the judge to permit this to be done.

Where a presiding judge in the exercise of his discretion permits an expert witness to give his opinion upon separate matters instead of answering a hypothetical question reciting all the facts in the case, it is open to the opposing party to show on cross-examination of the expert that there are conceded facts in the case which have to be accounted for and which were not accounted for in the opinion given by the witness in answering the question put to him upon a single point in his direct examination.

An experienced lineman does not assume the risk of an injury from a short circuit of electricity occasioned by a defective splice negligently made by his employer in a feed cable, when there is nothing on the surface of the cable to indicate the defect.

In an action, by the administrator of the estate of an experienced lineman against his employer, for the conscious suffering and death of the plaintiff's intestate, alleged to have been caused by a defective splice in a feed cable of the defendant, which when hit by a monkey wrench that the intestate was using created a short circuit of electricity, where it appears that the splice was a new one and was covered by fresh paint, and an expert testifies that striking a properly made splice in a feed cable with a monkey wrench would not have any effect, the question of the intestate's due care is for the jury.

TORT, by the administratrix of the estate of Martin A. Greene, for the conscious suffering and death of her intestate by reason of injuries received on May 24, 1906, while he was in the employ of the defendant as a lineman, from a short circuit of electricity created when the end of a monkey wrench which the plaintiff's intestate was using came in contact with a large feed cable at a joint or splice, which was alleged to have been in a defective condition in regard to its insulation; the declaration containing five counts, of which only the first and the fourth are material, both

alleging a defect in the ways, works or machinery of the defendant, the first count being for the conscious suffering of the intestate and the fourth count for causing his death.  · Writ dated September 21, 1906.

In the Superior Court the case was tried before *Brown*, J. The evidence material to the questions before this court is described in the opinion.

The defendant, having rested at the close of the plaintiff's case, asked the judge to direct a verdict for the defendant on each count of the declaration separately.  The judge ordered such a verdict as to the second, third and fifth counts, but refused to do so as to the first and fourth counts, which he submitted to the jury, the counsel for the plaintiff stipulating that, if this court should decide that upon all the evidence, excluding such evidence, if any, as was wrongly admitted by the judge subject to the defendant's exception, he was wrong in sending the case to the jury on either the first or the fourth count, the verdict on that count should be set aside and judgment should be entered for the defendant thereon and judgment should be entered for the plaintiff for the amount of the verdict on the other count, if the judge was right in sending the case to the jury on such other count; and that, if the case should not have been sent to the jury on either count, judgment should be entered generally for the defendant.

Before the charge the defendant asked the judge to give the following instruction :  "If the intestate, Martin Greene, was working for the defendant as a lineman at the time of the accident, and if the cause of his injury was a short circuit from a joint in a live cable through a monkey wrench or other piece of iron with or in connection with which he was working, then he assumed the risk of such an accident, and this action cannot be maintained."

The judge refused to give this instruction.   It was agreed that, if he was wrong in refusing to give it, judgment was to be entered for the defendant on both of the counts submitted to the jury.

The judge, among other instructions, gave the following :

"Now, when this flash came, when this short circuit — whatever it was — came, what happened to Greene?  Did he receive a charge of electricity that went through his body, or was he burned

by the flash when the wrench, jaws of the wrench, and the dog came in contact ?

"Now, there are a number of ways in which the accident might have happened. You have got to determine from the testimony what the way was. Of course if he was just coming from the water closet, as Powers said, just mounting the ladder, took up that wrench and engaged the jaws with the end of this bolt, and carelessly lost his grip, or his ladder slipped because it was carelessly placed, and in trying to recover himself he threw up his hand with the wrench in it, and grabbed the lower cable accidentally, brought that down on to the dog, and that is what caused the trouble, he cannot recover in this case. He can recover only if you find that in the careful use of that wrench it came in contact with the splice of the two-million cable."

The jury returned a verdict for the plaintiff on both of the counts submitted to them, on the first count in the sum of $3,000 and on the fourth count in the sum of $2,000. The judge reported the case for determination by this court, under the terms of the stipulations and agreements stated above.

The answers of the expert witness Forbes, to which the defendant excepted, and which are referred to in the opinion as they were numbered in the defendant's brief, and the questions in response to which they were given, were printed in that brief as follows :

"1. Q. With such a joint as that, made and taped in the way in which you have described, Mr. Forbes, what do you say as to whether or not striking it with a monkey wrench (such as I think you may have seen here), in going over or coming down and striking such a joint as you have described, taped as you have described, such a striking would cause the tape to cave in ? A. No, it would not.

"2. Q. What effect would such a striking have upon that tape, taped as you have described? A. I shouldn't say it would have any effect.

"3. Q. Assume, if you will, Mr. Forbes, that a blow struck upon a tape wound around a joint similar to this joint did cause the joint at the place where the tape was wound to cave in. Can you tell us what happened? A. I should say, in my opinion, the — when the wrench went over and came against the joint,

it struck a place where there was really nothing but paint, where, in the laying over the wires, laying the tape over the soldered joint, coming from a smaller section to an enlarged section, where the tape tends to rise up, that was laid diagonally, leaving a space; and when the tape came back, in a careless winding that space still remained.

"4. Q. I wonder if you can illustrate to us what you mean by that, using that piece of paper. A. Starting on the cable itself where the insulation has not been cut off (which would be represented by my wrist), and assuming my hand being larger, represents the increased size of the soldered joint, then if the tape is started back on the insulation and is carried forward, and is wound so as to exactly overlap, you get the effect; the tape being forced to follow what is really a conical surface, does not lay flat, it must be pulled or stretched. In order to make it lay flat, it would be necessary to wind a considerable distance. Of course that is the way a physician bandages a hand, on that principle. Now in winding that back and forth that way, and leaving cracks in the tape, between one layer of tape and the next, with one layer raised above the layer below it, then, in coming back again and going over that in that way, in my opinion a space was left (that would be represented by the space where my hand shows through this paper), which, when it was painted, was simply filled in with soft paint. The wrench coming against it, no resistance would be offered to prevent the metal coming against the copper.

"5. Q. Now I want to ask you, Mr. Forbes, as to whether or not after the tape was put in, and before the tape was painted, whether or not an inspection of the joint would disclose the opening which you have indicated, if it was there? After the paint was on, will you tell me as to whether or not inspection would tell? A. No, it would all be smooth, slicked over by the paint.

"6. Q. What do you say, Mr. Forbes, — is there any other way than the way in which you have described, by which a short circuit could be made by swinging over a monkey wrench, as has been described, and touching that joint? A. There is no other way, assuming the tape actually covered the wires. If there was one wire sticking out, so it wasn't covered, or anything

of that sort, there might be; but assuming the wire was taped, then to get through the tape I should say there was no other way.

"7. Q. I want to ask you, on a metal joint what danger, if any, there would be in a workman having one end of that monkey wrench attached to a nut, and touching with the other end of the monkey wrench a joint which was taped properly — which was taped as you have described as the usual method of taping a joint, what danger there would be of short circuiting? A. I should say it would not short circuit under those circumstances.

"8. Q. Whether or not, doing that under such conditions would be a safe thing for a workman to do? A. I should think it would be safe, yes."

*W. Flaherty*, for the plaintiff.

*W. G. Thompson*, (*G. E. Kimball* with him), for the defendant.

LORING, J. 1. To find for the plaintiff under the charge of the presiding judge the jury had to find that the two million cable hung within the circle described by the end of the monkey wrench as it revolved with its jaws engaged on the end of the bolt of the dog clamp.

The defendant's first contention is that the evidence did not warrant a finding to that effect.

The intestate and one Powers were engaged in boring a hole through a T iron which ran between two girders at the bottom of one of the underneath trusses of the defendant's elevated structure. The work of the defendant, of which the boring of the hole was a part, consisted in changing over four feed cables. These had been strung on brackets extending out horizontally over the street from the side of the elevated structure. They were to be strung on wooden stanchions extending from the bottom to the top of one of the underneath trusses of the elevated structure so that they would hang in a vertical plane within the sides of the truss. At the time here in question the four feed cables were temporarily hung by ropes substantially in their new position and one stanchion at least had been bolted on to the structure. The hole in question was being bored in one of the lower cross irons of the truss between the two bottom girders of

it. This was a T iron, the cross piece of the T being at the bottom of the iron as it was affixed to the girders. The plaintiff's intestate was standing on an ordinary ladder with his chest about opposite to the hole which he was boring. He had his right hand on a "dog clamp." This "dog clamp" was a heavy iron clamp, shaped somewhat like a horseshoe, with a bolt through the opening. There was a thread cut around the outside of the bolt, with a nut on the end of it. This clamp was over the top of the cross iron and was holding in position next to it what is called in the bill of exceptions an "old man." An "old man" consists of flat pieces of iron with two shorter pieces at each end of the main piece at right angles to it and running in opposite directions. The purpose of the "old man" was to afford a bearing for a ratchet used in boring the hole through the cross iron. At the time in question the position of the ratchet had to be changed and the 'intestate was holding with his right hand the clamp (which held the cross piece of the "old man" next to the cross iron) and was about to loosen the bolt of the clamp with a monkey wrench when the accident happened. Powers (who was working with the intestate and was working the ratchet) was sitting on a piece of wood running from girder to girder, parallel to the cross iron here in question and separated from it by the "old man." Powers testified that the intestate had been to the water closet, that he had returned, had ascended the ladder and had grasped the clamp with his right hand; that he (Powers) saw him reach for his monkey wrench which was hanging from a round of the ladder by a wire hook. That he (Powers) then turned one side to spit out some tobacco juice when there was a flash which burned his face; that he fell to the ground and that the intestate also slid down the ladder to the ground, feet foremost. The monkey wrench was made of iron from end to end, with wooden faces clamped on the sides at the upper end to make a handle. The plaintiff's theory was that, as her intestate turned the monkey wrench to loosen the bolt of the clamp, it came in contact with a defective splice in a two million cable which hung above it. The two million cable was the next one to the lowest of the four cables as they hung at that time over the bolt. The defendant's contention is that on the evidence this cable was outside the

circle described by the end of the wrench as it revolved with jaws engaged on the end of the bolt. The intestate was badly burned about the face, chest, arms and hands, and died of these wounds seven days after the accident. Before his death he told his doctor how the accident happened. His doctor testified that he said that "he was either tightening or loosening a rivet on a machine he called the 'old man' . . . and that the monkey wrench that he was using, in coming around, struck the cable and it dented, there was a flash and he slid down the ladder . . . to the ground." He said "that it was a new splice at that point"; "that it looked all right." The witness added that it was his "impression" that the intestate said that when his monkey wrench struck the cable "it caved in." It appeared that the elevated structure at the point here in question is on a curve, and that the brackets on which the feed cables previously had been strung were on the inside of this curve. For that reason the cables had to be lengthened. The splice mentioned above had been made in the two million cable within a few days, to lengthen that cable for this reason. There was testimony from an expert that there were marks on the monkey wrench which indicated that the electricity which made the short circuit might have entered from the upper end of the wrench.

What the defendant relies on (in its contention that the evidence did not warrant a finding that the two million spliced cable was within the circle of the monkey wrench with its jaws engaged on the end of the bolt) is the testimony elicited by it on the cross-examination of Powers. Powers testified that the cables were above the cross iron and not in contact with it. He said that he did not know how far they were above the top of the cross iron, but on being pressed he reluctantly gave as an estimate that the one million cable (the lowest of the four) was six inches above the top of the iron, that the two million cable was six inches above that and that the nut on the end of the bolt of the clamp was three to four inches below the top of the iron. This estimate made the two million cable fifteen to sixteen inches above the nut. The length of the wrench from the inner face of the lower jaw to the upper end of it was eleven inches.

The short answer to this contention of the defendant is that if the jury believed that the doctor was accurate in his testimony of what the intestate said and that the intestate told the truth, Powers's estimate of these distances was wrong.   For although the intestate spoke of one cable only the cable he spoke of was the spliced cable, and there was no splice in the one million cable.   He said that the monkey wrench hit the spliced cable. In addition there was evidence from an expert that if the tape with which a splice is wrapped had been carelessly wound about the splice a hole might be left which would be covered from view by the paint with which the whole is coated and so, if a wrench were to come up against such a weak spot in the taping, the splice would "cave in."

It had to be admitted that the lower cable burned through and parted while the spliced cable did not, that the iron of the monkey wrench back of the jaws was in part melted, and that the top of the clamp was melted.   With these facts in the case it was hard to believe that Powers's estimate of the distances was wrong and that the intestate made a short circuit in the spliced cable in the way he was made by the doctor to say that he did and that he could and did strike it with the wrench while its jaws were engaged on the bolt of the clamp.   But he said that he did, or what he said could be found by the jury to have meant that.   In this conflict of evidence it was for the jury to decide what the fact was.

2. The defendant next contends that a material part of the testimony of the expert was admitted under its exception and was "wrongly admitted."   It appears from the report that the case was sent to the jury on the first and fourth counts "on the stipulation of counsel for the plaintiff that if the Supreme [Judicial] Court should decide that upon all the evidence, excluding such evidence, if any, as was wrongly admitted by me over the defendant's objection and exception, I was wrong in sending the case to the jury," judgment should be entered for the defendant.

The first contention of the defendant in this connection is that the presiding judge allowed the expert to testify on matters of common knowledge and that such evidence was "wrongly admitted" within the meaning of the above stipulation and therefore

must be excluded. The defendant complains of the answers to certain questions specified in his brief numbered 5, 7 and 8. We are of opinion that none of these questions is open to this objection, and if they were the expert answered them rightly. The jury were entitled to consider the facts whether they were testified to by the expert or were matters of common knowledge. It follows that the judge was not " wrong in sending the case to the jury " so far as these facts are concerned.

The defendant has put great reliance upon the case of *Gilbert* v. *Guild*, 144 Mass. 601. In that case a question to an expert was excluded by the presiding judge on the ground that it was a matter of inference to be decided by the jury on the facts in evidence and the opinion of the expert. That does not help this defendant in this contention.

The defendant's second contention in this connection is that the assumptions of fact upon which the opinion of an expert is asked and based should be reasonably clear, and that where certain facts are agreed and are also obviously necessary as a premise to the formation of any instructive opinion upon the expert question presented, the question put to the expert should include such agreed fact or facts, or, at least, should not be inconsistent with them. The defendant complains that this rule was not observed in the answers to questions numbered in its brief 1, 2, 3, 6, 7 and 8. We are of opinion that the presiding judge in his discretion had a right to allow the plaintiff to ask the expert as to the possibility of a short circuit being made " by swinging over a monkey wrench, as has been described," meaning as had been described in Greene's statement testified to by the doctor, and that the same is true of questions 1, 2, 3, 7 and 8, and that in doing so he did not violate the rule stated above.

The defendant in this connection also contends that in questions 3, 6, 7 and 8 the expert was allowed to give his opinion on a hypothetical case without taking into consideration facts which it was conceded existed in the case at bar. The question numbered 3 may be taken as an example. By allowing that question to be put and answered the presiding judge allowed the expert to testify to the significance of the fact (if the jury should find it to be the fact) that the splice " caved in " when " a blow

[was] struck upon a tape wound round a joint [splice] similar to this." If a presiding judge thinks that the jury will get more help upon a matter which is the subject for expert testimony, by allowing the expert to give his opinion upon separate matters than by answering a hypothetical question involving all the facts in the case, it is within his discretion to do so. See in this connection *Phillips* v. *Lockey Piano Case Co.* 205 Mass. 59. If the party producing the expert is allowed to proceed in that way in the examination of his expert witness, it is open to the other party to show on the cross-examination of the expert that there are conceded facts in the case which have to be accounted for and which were not accounted for in the opinion expressed by him on the single point on which he had given an opinion in his direct examination.

3. The next contention of the defendant is on the merits of the case. It was conceded that as a result of the short circuit here in question the one million cable burned apart and the two million cable although burned did not drop. It was also conceded that the intestate, being an experienced lineman, assumed the risk of the insulation of the one million cable having become worn out, and therefore if the short circuit was made by the monkey wrench striking the one million cable at a point where the insulation was made no case was made out. See *Chisholm* v. *New England Telephone & Telegraph Co.* 176 Mass. 125. The defendant's contention is that on the evidence it is at the best a matter of conjecture which cable was touched by the monkey wrench, and so no case was made out by the plaintiff within cases like *Jameson* v. *Boston Elevated Railway*, 193 Mass. 560; *Horne* v. *Boston Elevated Railway*, 206 Mass. 231. The answer to that is that the intestate said that "the matter with the cable" which he hit with the monkey wrench was "that it was a new splice at that point."

4. The defendant has also contended that an experienced lineman assumes the risk of danger coming from a splice negligently made by the defendant in one of its cables (part of its ways, works or machinery), when there is nothing on the surface of the cable to indicate that fact. We are of opinion that he does not, and for that reason the presiding judge was right in refusing to give the ruling asked for by the defendant.

5. The expert testified that striking a properly made splice in a feed cable with a monkey wrench would not have any effect. The intestate said that the splice was a new one and it seems to have been conceded that this was apparent from the fresh paint which was upon it. In the face of this testimony and this fact the question of the intestate's due care was for the jury.

The entry must be

*Judgment on the verdicts.*