COMMONWEALTH *vs.* JOHN F. NOXON.

Berkshire.     October 23, 24, 1945. — May 10, 1946.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & WILKINS, JJ.

*Homicide. Practice, Criminal,* Disclosure of evidence of Commonwealth; Discretionary control of evidence; Requests, rulings and instructions; New trial. *Pleading, Criminal,* Indictment, Bill of particulars. *Evidence,* Of consciousness of guilt; Failure to produce evidence; Photograph; Opinion: expert; Relevancy and materiality; Evidence unlawfully obtained; Competency; Experiments; In rebuttal; Presumptions and burden of proof. *Witness,* Expert witness, Cross-examination.

An inference of consciousness of a father of being guilty of murder of his Mongoloid child by causing a current of electricity to pass through the child's body was warranted from evidence that on the evening of the child's death the defendant had burned certain clothing of the child and an electric cord with exposed wires which, he had stated to a physician whom he had called, had accidentally caused the death, and also from evidence that, when informed that the medical examiner, and, later, the district attorney, were further to interview him, he had made notes respecting circumstances of the death.

Failure of a defendant charged with crime to call his wife, who was available, as a witness in his behalf respecting circumstances known to her, warranted an inference that, if so called, her testimony would be unfavorable to him.

Circumstantial evidence warranted a verdict of guilty at the trial of an indictment against a father for murder of his six months old Mongoloid child by causing a lethal current of electricity to pass through the child's body.

No abuse of discretion nor error appeared in the denial of a motion, by a defendant charged with murder, which in effect sought to compel the Commonwealth to disclose part of its evidence by allowing the defendant to examine certain articles in its possession and to make certain tests and by furnishing him with certain information and copies of certain documents.

An indictment for murder in the statutory form set forth in G. L. (Ter. Ed.) c. 277, § 17, to which were added particulars that the crime was committed by causing a current of electricity to pass through the body of the victim until he was dead furnished ample information as to the nature and grounds of the crime charged; and motions to quash and for further particulars were denied properly.

No error appeared in the circumstances in the admission in evidence, at the trial of an indictment for murder by use of electricity, of certain enlarged photographs and negatives of parts of the body of the victim, of photographic enlargements of specimens of his skin, and of photomicrographs of a cross section of his skin.

Rulings by the judge presiding at the trial of an indictment for murder respecting whether the subject matter of certain questions was proper for opinion evidence, whether qualification of a certain witness as an expert was proved, the form of hypothetical questions to various witnesses admitted to be experts, and the responsiveness of answers to such questions, disclosed no abuse of discretion or other error.

Certain objects of personalty taken from the residence of a defendant on trial for murder of his child in a room in the residence by use of electricity, and certain articles produced by him at the request of the Commonwealth, were properly admitted in evidence as pertinent to issues involved.

The rule of law established in this Commonwealth, that articles of personalty illegally obtained are admissible in evidence at the trial of a criminal case if they are pertinent to issues there involved, is applicable also to severed realty.

At the trial of an indictment for murder by the use of electricity no abuse of discretion and no error appeared in the admission in evidence of a model of an electric cord which had been destroyed; of testimony as to experiments in cutting a similar electric cord; of a copper print test to show the presence of copper on the back of a metal tray which might have acted as a ground; and of experiments on "control skin" of the victim.

Questions in cross-examination of an expert, called by the defendant, respecting a certain conversation he had had with the defendant's counsel as to articles shown him by counsel were not improper at a certain criminal trial.

There was no error at a criminal trial in the admission of evidence of the Commonwealth in rebuttal of evidence produced by the defendant.

At the trial of an indictment charging murder, physicians who attended at an autopsy performed upon the victim might properly testify as experts as to what they found on examination of the body and as to their conclusions as to the cause of death, although the autopsy was not authorized as required by statute.

No error appeared, at the trial of an indictment charging a father with murder of his Mongoloid child, in a refusal of the judge to instruct the jury that the "fact, if it be proved to the jury to be a fact, that the deceased son of the defendant was a Mongolian type does not prove or tend to prove a motive on the part of the father for taking his life," where it appeared that the defendant, shortly after the child's death,

had stated, "Of course I have a motive" and "I suppose I could have a motive," and the judge correctly and adequately instructed the jury on the subject of motive.

A judge presiding at a criminal trial is not required to single out particular evidence on an issue for specific comment in instructions to the jury.

A request for an instruction at the trial of a criminal case that, the "Commonwealth having introduced as part of its case statements of the defendant as to happenings, observations and state of mind, and there being no evidence contradicting them, the Commonwealth is bound by those statements, observations and testimony," properly was refused: the jury were not obliged to accept or reject the defendant's statements in their entirety, but could give credence to only such portions as they deemed trustworthy.

It is not error at a criminal trial to refuse a request for an instruction to the jury, even though it embodies a correct statement of law, if it is not pertinent to any issue at the trial.

There was no error in the denial of motions for a new trial of an indictment for murder where they raised the same questions presented at the trial by a motion for a directed verdict of not guilty.

No abuse of discretion was shown in the denial, after a hearing on affidavits of a motion for a new trial of an indictment for murder based on allegations that, by reason of false and malicious statements made concerning the defendant prior to the trial and of consequent adverse public attitude toward him, an unprejudiced panel could not be provided for the trial.

The mere fact, that a jury hearing an indictment for murder, after a trial lasting more than a month, deliberated only about six hours before bringing in a verdict of guilty, did not require the granting of a new trial.

No abuse of discretion and no error was shown in the denial of a motion for a new trial of an indictment based on averments of bias, prejudice and hostility of certain jurors which the trial judge, after a hearing on affidavits and oral testimony, found were not true.

INDICTMENT, found and returned on January 13, 1944.

The case was tried before *Pinanski*, J., beginning on May 31, and ending on July 6, 1944.

*J. B. Ely & W. J. Donovan*, (*R. T. King & G. V. Mottla* with them,) for the defendant.

*C. R. Alberti*, District Attorney, (*A. W. Bettigole & V. O. Coté*, Assistant District Attorneys, with him,) for the Commonwealth.

DOLAN, J.   On January 13, 1944, the defendant was indicted for the murder of his infant son, Lawrence S. Noxon, at Pittsfield, on September 22, 1943. The indictment is in two counts. The first count charges that on

September 22, 1943, at Pittsfield, in the county of Berkshire, the defendant "did assault and beat Lawrence S. Noxon with intent to murder him, and by such assault and beating did kill and murder the said Lawrence S. Noxon." The second count charges that the defendant "at the time and place aforesaid did assault and beat Lawrence S. Noxon with intent to murder him by causing a current of electricity to pass through his body until he was dead, and by such assault and beating by causing a current of electricity to pass through his body until he was dead, did kill and murder the said Lawrence S. Noxon." The defendant having moved for a bill of particulars, the Commonwealth filed particulars as follows: "Comes now the Commonwealth in the above-entitled indictment and with reference to Count One thereof sets forth the following particulars: That the said John F. Noxon at the time and place mentioned in said indictment did assault and beat Lawrence S. Noxon with intent to murder him by causing a current of electricity to pass through his body until he was dead, and by such assault and beating by causing a current of electricity to pass through his body until he was dead, did kill and murder the said Lawrence S. Noxon." The defendant's motions to quash the indictment and for further particulars and his motion to dismiss the indictment were denied, subject to his exceptions. The defendant was found guilty of murder in the first degree, a sentence of death was imposed, and the execution of the sentence was stayed as required by G. L. (Ter. Ed.) c. 279, § 4, as appearing in St. 1935, c. 437, § 3. The case comes here upon the defendant's appeal accompanied by an assignment of errors, a summary of the record, and a transcript of the evidence, as required by G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341.

The defendant's contentions are these: "1. The evidence was as matter of law insufficient to warrant a jury of reasonable men in properly finding defendant guilty of any crime. 2. The action of the trial judge in denying defendant's motions attacking the sufficiency of the indictment and of the particulars furnished constitutes prejudicial error.

3. The action of the trial judge in denying defendant's motions to be allowed access to evidence in the possession of the Commonwealth constituted prejudicial error. 4. The trial judge erred in seating certain of the jurors. 5. The action of the trial judge in admitting, excluding and refusing to exclude evidence at the trial constituted prejudicial error. 6. The action of the trial judge in denying certain of defendant's requests for rulings constituted reversible error. 7. The action of the trial judge in denying defendant's motions for new trial constituted prejudicial error. 8. The instant case is a case where justice has not prevailed within the meaning of G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, and hence it is within the discretion of this Honorable Court to go beyond the exercise of its ordinary powers of review and to render its own decision to the end that justice will prevail."

We proceed to the consideration of the defendant's first contention based on assignments of error numbered 63, and 90 to 93, inclusive, to the effect that his motions for directed verdicts of not guilty should have been granted. These assignments of error were the first argued before us. It is necessary to deal only with his motions for directed verdicts of not guilty filed at the close of all the evidence. See *Meeney* v. *Doyle*, 276 Mass. 218, 221.

A recital at this point of certain undisputed facts is appropriate. The defendant was a practising attorney in Pittsfield where he was born on October 8, 1896. While he was an undergraduate at college in 1917 he enlisted in the armed service of the United States, was commissioned a lieutenant in the infantry, served at the front, was gassed, and was confined for several months in a military hospital abroad. Returning to this country, he resumed his studies at college. Completing his academic course, he was preparing to enter a law school when stricken with infantile paralysis which completely incapacitated him for a year. Upon his recovery he began and completed the study of law, and was admitted to the bar of this Commonwealth in July, 1924. As a result of infantile paralysis he lost the use of his left leg completely except by wearing a heavy steel brace from hip to

instep. His right leg is about thirty per cent normal. As a result of this condition he is unable to walk more than a step or two without a cane or canes. He is able, however, to walk short distances, as from room to room in his home or office, with one cane; otherwise, he must use two canes. He was married in May, 1925, and a son John was born of the marriage on July 7, 1928. This son is normal in all respects. The deceased son, Lawrence S., hereinafter called the baby, was born on March 26, 1943. After his admission to the bar the defendant entered the law office of his father, who had been successfully engaged in the practice of law in Pittsfield for many years. In 1927, the defendant's father was struck by a street car, and as a result both of his legs were amputated. The defendant and his wife and their son John lived in a part of the same house with him until his death in January, 1936. During that period he was either in bed or in a wheel chair. The defendant thought that during the last three or four years of his father's life he was blind. Late in 1939 the defendant and his family moved to the house in which the baby died. The jury took a view of the premises.

There was evidence as follows: Dr. George P. Hunt, a specialist in the care of children, called as a witness by the Commonwealth and conceded by the defendant to be eminently qualified as a pediatrician, who practised as such in Pittsfield for many years, testified in part as follows: After the birth of the baby (on March 26, 1943) he was called to attend him about April 20 at the home of the defendant. The appearance of the baby was peculiar, of the Mongoloid type, indicated by "slant-like eyes, the outer corner of the eye being elevated higher than the inner corner of the eye; [by] a flat, stubby, pudgy nose, [and by] a slight tendency to thick lips and tongue." At the time of that visit the doctor found the heart of the baby normal, and the motion of his joints appeared normal. When the baby was about two and one half to three months old, the baby's mother and Dr. Hunt questioned "whether the baby could see." Certain tests were made which demonstrated that he could see but could not retain a constant focus.

While the doctor was moving his arm the baby "wouldn't follow you as a normal baby would, whether it was a bright object or your hand." Up to the time of his death his activity was distinctly below that of a normal child. If placed on his abdomen he would not raise his head. His lack of normal motion was due to poor muscular development. All his muscles were flabby and soft, which is typical of the Mongoloid child. A normal child would raise its legs, kick and be active. "This baby did not." His weight progressed normally, but the length of his body and arms was retarded. If laid down, he stayed there without much activity. During the period of observation by Dr. Hunt the baby's eyes were moving almost continuously. On or about August 13, 1943, Dr. Hunt talked with the defendant and recommended that the baby be taken to the Children's Hospital in Boston for an examination by Dr. Richard M. Smith, a specialist in children's diseases, stating that he considered that the baby was not right mentally and that he wished the defendant and his wife to obtain advice from people who saw more of these cases than he had seen. As a result an appointment was made for Dr. Smith to see the defendant, Mrs. Noxon and the baby. Dr. Smith testified in substance as follows: On August 24, 1943, he examined the baby, having first interviewed the parents and obtained from them a history of their impressions of the baby. He found the baby well nourished and well developed, but inactive, placid, and ineffective in movements and in resistence to examination. The bridge of his nose was flat; there was free range of both active and passive motion in his arms and legs, but their muscles were flabby. When placed in a sitting position he fell forward limply, and when held upright he made no attempt to support his weight on his legs. While there was no limitation or restriction of motion of his arms and legs, their activity would be less vigorous and less powerful. If placed on his back he could not roll over. "Mongolism is a disease which is present at birth, which interferes permanently with the child's physical and mental development. These children rarely reach adult life. Their physical development is

always slower . . . Physically, their development is extremely slow, but eventually if they live, they grow to adult stature, so far as physical height and weight is concerned . . . . Mentally, however, their retardation is greater then their physical retardation . . . . These children are always dependent individuals. They never attain either economic or social independence. The range of their mental development is very variable . . . even the ones that attain the greatest mental development never have a mental capacity beyond a child of from six to eight or nine years old . . . . In other words, they may develop even beyond this six or eight years in particular fields, or they may be very much below the average development of a particular child in some respects. . . . they're different from other children, not only in the fact that they're retarded, but that they develop very unevenly." Dr. Smith further testified that he concluded his examination of the baby on August 26; that on that day he talked with the defendant and Mrs. Noxon, stating in substance his diagnosis of Mongolism, that the baby's likely future development would be as before set forth, that he would always need supervision, that he could be cared for in their home but, if that were done, it would require most of the time of one individual, and that the baby would never be able to take care of himself; and that he suggested as an alternative that the baby be placed in an institution or boarded with some family, pointing out that there were some advantages in arranging for the care of the baby outside of the home, since they had another older child who was normal. Dr. Smith told them that he would be glad to assist them in any way in developing these plans, but advised them not to make a decision at that time. The defendant and Mrs. Noxon accepted Dr. Smith's diagnosis courageously and returned to their home with the baby.

We continue with the recital, in substance, of further testimony of Dr. Hunt. On September 22, 1943, Dr. Hunt made a Schick test (at his office) on the baby's right arm for diphtheria and injected whooping cough vaccine high up in the buttock. The Schick test was made first by

means of a hypodermic syringe and a twenty-six gauge
needle inserted in the upper portion of the right forearm
"pretty close to the fold of the forearm," into which two
punctures an inch and a half apart were made between the
two layers of skin, the outer or epidermis, and the inner,
the true skin or "cutis vera" (called by other witnesses the
"corium"). Punctures for the Schick test cause wheals like
mosquito bites which disappear in a half hour to an hour.
Mrs. Noxon, who had been present, left the doctor's office
with the baby at about 4 P.M. Just before 6 P.M. of the
same day Dr. Hunt received a telephone call from the de-
fendant, who said that "something had happened to the
baby" and requested Dr. Hunt to "come right out." Dr.
Hunt went to the defendant's home and met the defendant
in the hall, who told him that he had been about to put
some tubes in the radio (in the book room); that he had
gone to his garage to get some tools; that before doing so
he took the baby from a chair and "put . . . [him] on the
floor while he was out of the room"; that when he returned
"he smelled something burning and saw the baby had got
tangled up with the cord, the trouble cord with the lamp
attached which, as Mr. Noxon explained, was attached from
the outside wall extending presumably beyond where the
baby was lying on the floor"; and that the cord was attached
to the north wall with the lamp end extending toward the
baby. When Dr. Hunt entered the book room the baby
was lying on his back in the chair (from which he had pre-
viously been removed). He had on a shirt and a diaper.
There was a little bloody mucus about his nostrils. There
were some radio tubes in pasteboard containers scattered
on a couch. The defendant had in his hand the so called
"trouble" cord to which was attached a plug at one end
and an electric bulb at the other end.[1] Dr. Hunt saw a

---

[1] The bulb or lamp was protected by a wire cage (weighing seven and one
half ounces) with a hook attached beneath the cage. For the most part
throughout the trial, the cord to which the lamp and protecting cage were
attached at one end, commonly known as a trouble lamp, was referred to as
the trouble cord rather than as the extension cord to which such lamps as
well as other domestic electrical devices are commonly attached. Like counsel
in the case, we refer to the cord attached to the trouble lamp as the "trouble
cord."

metal tray on a table in the book room, but the defendant said nothing about it. Dr. Hunt saw no tools. Examining the baby, Dr. Hunt found a blistered area on the baby's left forearm at about the fold inside the elbow. In certain portions the skin was destroyed. The doctor saw two tiny needle pricks on the baby's right arm where the Schick test had been made, and an inch below he saw "what looked to . . . [him] at that time like a scratch." He did not observe the so called dumbbell burn on the back of the baby's left arm. Photographs, previously admitted in evidence, of the burns other than the dumbbell burn were identified by Dr. Hunt as fair representations of the marks and burns as seen by him. He lifted the baby's shirt and listened with a stethoscope for the heartbeat. It was absent, and Dr. Hunt said that the baby was dead and that he would have to call Dr. England, the medical examiner. Dr. Hunt also testified that, "because of the retarded mental and physical development, and the poor muscle strength of this baby," he did not believe it possible that the baby could have lifted the trouble cord, or wrapped or wound it around his left arm, even if it were assumed that the baby could reach a distance of twelve inches. Dr. Hunt telephoned to Dr. England, telling him that the baby was dead and requesting him to come.

Dr. England testified in substance that having arrived at the defendant's house and having been informed by Dr. Hunt that the baby had been examined by him at 4 P.M. that day and everything had been found "O. K.," and that the baby was mentally deficient and of the Mongolian type, as verified by Dr. Smith, he talked with the defendant, who told him that he arrived home from his office at about four o'clock; that he was puttering with the radio; that Mrs. Noxon brought the baby in, placed him on a chair and went to the garden to pick corn; that he had to go to the garage to get "a pair of pliers and a screw driver"; that before going to the garage, he placed the baby on the floor because he was wet; that he went to the garage to get the tools; that he was gone three to five minutes; that when he returned he smelled something burning; that he looked and saw the wire of the trouble cord looped around the baby's left arm;

and that he removed the wire, placed the baby on the chair, and telephoned Dr. Hunt. When Dr. England entered the book room where the radio and the baby were, the trouble cord was lying on the floor. The plug was in the socket in the north end of the room, and the end of the cord with the lamp and cage attached was extending straight into the room, "straight south." The defendant told Dr. England about the baby's mental condition, the examination of the baby in Boston, the unfavorable prognosis that the baby probably would not improve physically or mentally, and that he had been advised to place him in an institution. The body of the baby was lying in the chair. (He had been covered with a blanket by Dr. Hunt.) Dr. England removed the blanket and the diaper, and pulled up the shirt. The diaper was wet. He observed the blood tinged mucus at the nostrils that had been observed by Dr. Hunt. He found an irregular shaped third degree burn on the baby's left arm. "A third degree burn is when you get actual destruction of tissue." That burn resembled a clover, part brownish, part reddish. Dr. England observed a brownish red area on the back of the baby's left arm, consisting of two parallel lines about a quarter of an inch apart and perhaps an inch and a quarter long. On the right arm in about the central portion of the anterior aspect, that is, the palmar aspect, Dr. England saw a discolored area about three quarters of an inch long and about a quarter of an inch wide. Photographs of the baby's arms, previously admitted in evidence, were identified by Dr. England as fair representations of what he saw on September 22 at the defendant's home. The photographs are before us.

Dr. England saw some radio tubes in their cartons, he thought on a table at the west end of the room. He noticed a tray in the room but paid no particular attention to it. Nothing was said about it, and he saw no tools in the room. The radio which "apparently rested against the north end of the room" was at an angle of about forty-five degrees with the wall. Dr. England examined the trouble cord in the presence of the defendant and Dr. Hunt. He removed the plug from the receptacle at the north end of the room

and measured the cord with a tape measure.  It measured twelve feet from the plug to the lamp.  He went over the cord.  For about five feet from the lamp the two strands of the cord were untwisted.  Running his fingers along the cord, Dr. England came to a place about two feet from the lamp where there was an area three quarters of an inch long on one of the strands at which the fabric covering and insulation were missing.  Practically opposite that spot, the fabric covering and insulation on the other strand were missing for about one quarter of an inch.  The bared wires were of bright coppery color, they "were not cut in any way . . . [he] didn't see any loose ends," and the four edges of fabric and insulation were "clean cut . . . not frayed." (The defendant in his testimony stated that the edges of the cord at those points were not frayed.)  The radio combination aerial and "ground" wire, [1] "the black wire," was lying on the floor.  Dr. England told the defendant that the next step was to notify the undertaker, and left the defendant's house.  Dr. Hunt notified the undertaker designated by the defendant.

On the following morning Dr. England telephoned to the defendant that he would like to go over the situation again.  He arrived about 10 A.M. at the defendant's house and the defendant started to tell him about the baby's death in about the same terms as on the evening before, except that he said that, because the baby was wet, he placed him on the metal tray to save the rug, with his buttocks on the tray and his head and shoulders on a pillow.  The defendant told him that he had destroyed the trouble cord and the baby's diaper and shirt in the incinerator.  Dr. England asked him a few questions about the cord, and he said that it was usually kept in the garage and was about two years old.  Dr. England asked the defendant whether the ground wire was in contact with the tray.  The defendant replied that he did not know.  Leaving the defendant's house, Dr. England met Chief of Police Sullivan and had some conver-

---

[1] The aerial and ground wires, separately insulated, were encased in an insulated cable for some distance, but as they extended toward the radio they emerged from the cable with the end of each wire exposed for attachment to the radio.

sation with him, as a result of which Dr. Alan R. Moritz was requested to come to Pittsfield.

On the morning of September 23, 1943, following the visit of Dr. England, John L. Sullivan, chief of the Pittsfield police department (hereinafter called Chief Sullivan), accompanied by Captain Marcel and Inspector McColgan of that department, went to the defendant's house. The defendant invited them into the house and, upon being asked what had happened the day before, said that he had been trying a case that day, that of the Cornell-Dubilier Company against the Sprague Specialty Company, involving "secret processes on micro-condensers and capacitators, having to do with radio"; that he arrived at his home at about 3:30 P.M.; that Mrs. Noxon was not then at home, having taken the baby to Dr. Hunt's office; that he had had some trouble with the radio and was going to change the tubes; that the tubes that he had bought "last winter" were in the pantry; that he went to the garage and got a trouble cord that "he had taken down the Sunday before" and brought it into the book room; that he plugged it into the receptacle on the north side of the book room beneath the bay windows; that "it lighted"; that he "snapped" the light off, and left "it" lying on the floor; that he went to the pantry, got the tubes, six in number, placed them on a nickel tray, brought them into the book room, put them on the floor, and pulled the radio out at an angle so that he could "get at it"; that at that time Mrs. Noxon, who had returned, brought the baby in and placed him in a brown upholstered chair at the left of the radio, saying that she was going to the garden to pick some corn; that shortly thereafter he (the defendant) decided that he wanted some tools; that he picked the baby up so that he would not fall; that he noted that the baby's diaper was wet; that he placed him on the tray which was on the floor, placing a pillow under his head; that he "was gone" to the garage three or four minutes; that, upon returning and entering the book room, he smelled something burning and saw part of the wire (the trouble cord) on the baby's chest and some of it around the baby's left arm; that when he moved the radio out there was a black cord, a

combination antenna and ground cord; that he wiggled it and noticed it was loose; that he thought that it was on the left side of the tray, "or near or under the tray," when he went out to the garage; that he thought that the trouble cord was on the right side of the tray, the right side of the baby, about a foot away; that when he returned from the garage he picked up the trouble cord; that when he did so the baby's left arm came up with it; that he dangled the wire and the arm came loose; that there was water on the tray and he spilled it on the rug; and that he got in touch by telephone with Dr. Hunt requesting him to come, saying that "something had happened to the baby." During this visit there was much conversation between the police authorities and the defendant concerning the position of the various objects in the room at the time when the baby was placed on the tray by the defendant, from which the jury could find the following facts: The radio, which was located at the northeast corner of the book room at one side of but close to the bay windows, had been moved from the living room to the book room during the previous fall. A combination aerial and ground wire was run from a combination radio plug and receptacle in the southeast corner of the living room under the living room rug through the door to the book room and to the radio in the northeast corner by the bay windows. The electrical power for the radio was secured from the outlet in the north wall. (The ground wire was fastened to the water pipes in the cellar, and the aerial wire was insulated through to the attic and then run along within six feet of the ridge of the house "in a parallel with the ridge.") Chief Sullivan asked to see the trouble cord, and the defendant said that on the night before he had put it in the "gas type incinerator" downstairs, after cutting off the plug at one end of the cord and the lamp and cage at the other end; that before doing so he tried to tape the spots (the bared spots) on the wires, but upon reconsideration decided to "get rid of the damn thing" as he did not want anyone else to "get hurt with it"; that he did not want his son John to "get hurt with it"; and that he also put the baby's shirt, which had blood on it, and the baby's diaper in the incinerator and

destroyed them.   The defendant stated to Chief Sullivan that the baby was not a normal baby and that he and his wife had known that fact since August 24 or 26 after the examination of the baby by Dr. Smith, and related the advice of Dr. Smith as to placing the baby in a home, saying that "he never wanted any child like his in any damned home like Belchertown."   The police took the plug and the lamp and the cage that had been attached to the trouble cord to the police station, together with the tray and a green pillow upon which the baby had been placed by the defendant. They were introduced in evidence.   The police went to the basement and removed the remnants of the trouble cord from the incinerator.   The insulation had been burned off, and the remnants were of the part of copper wire contained in the cord that was cut off by the defendant before it was burned.   The radio tubes in cartons were taken by the police. The police also took the black wire, the combination aerial and ground wire with two copper wires exposed.   Chief Sullivan told the defendant that he had been very careless in destroying the cord, and the defendant replied, "I suppose there could be a motive."   Following this interview, Chief Sullivan, Captain Marcel and Officer McColgan went to the undertaking rooms and saw the baby's body, where pictures of the body were taken.   Chief Sullivan and Captain Marcel returned to the Noxon home that afternoon shortly after five o'clock and interviewed the defendant.   In the course of that interview the defendant stated that he had been receiving instructions in the Cornell-Dubilier litigation from one Beyers and one Bailey, representatives of that corporation; that he had talked about electricity with one Whittlesey, who was connected with the local power company and the Berkshire County Savings Bank; that he, the defendant, had read a newspaper account[1] concerning a woman who had come in contact with an "electric wire" a "couple of weeks before" September 22, 1943, the date of the baby's death.   Chief Sullivan said to the defendant, "This whole affair looks suspicious to me."   The defendant

---

[1] Later identified by him as an article printed on August 20, 1943, in a Springfield newspaper.

then said, "You talk as though you thought I killed the baby." Chief Sullivan replied, "I suspect you did." The defendant called his wife saying, "Listen to what the Chief thinks," and told her what 'the chief had said. Concerning the trouble cord the defendant said that he found it in the garage; that it had been hanging over insulated pipes in the garage; that "it bumped him in the head"; that he took it down on the Sunday preceding September 22, 1943, and left it in the garage; and that he thought the bare spots had been caused by hanging over the insulated pipes in the garage. There was evidence that when in use in the garage the cord at the lamp end hung about three feet from the ceiling, and that the lamp end would hang from the insulated pipes at a point about twelve inches from the outer edge of the work bench. Chief Sullivan requested the defendant to go to police headquarters the following morning at ten o'clock.

Whittlesey testified in substance that he was vice-president of the Western Massachusetts Electric Company and president of the Berkshire County Savings Bank; that in the first week of September, 1943, he had a conversation with the defendant at the rooms of the bank for which the defendant had been counsel; that in the course of the conversation the defendant stated that he had read a newspaper account of a nearly fatal accident in a residence from the electrical service that is usually supplied to residences, and asked the witness if he thought such a thing were possible; that he replied that he had heard of at least two other cases from sources that he thought were reliable; that he questioned whether the heart might not have been a contributing cause. The witness explained to the defendant the circumstances attendant upon those cases, stating that in one case the victim was repairing wiring in a basement while standing on a wet floor and came in contact with the wiring, and that in the other case the victim was in a bathroom and had one hand on a plumbing fixture and the other grasping a defective brass socket. The witness further testified that he told the defendant that the potential normally used in houses in Pittsfield was one hundred ten

to one hundred fifteen volts, sometimes one hundred twenty "but it is rarely around here." The defendant had stated to the police that he did not know what was the voltage of the electric current in his home. There was evidence that tests made by the engineer and other employees of the electric power company that serviced the defendant's house showed the potential to be one hundred eighteen volts. These tests were made at the outlet where the trouble cord had been connected. There was evidence that the lines and transformers which supplied the current to the house were in good order.

On the morning of September 24 (Friday) the defendant and his wife were present at the police station. In answer to questions the defendant stated that when he returned to the book room and smelled something burning he grabbed the cord and "pulled it off"; that in pulling it off he noticed it was around the baby's arm, because "it pulled the arm up as . . . [he] started to pull the cord on the body"; that he "gave the cord a couple of jerks, and it loosened up, and . . . [he] pulled it off"; that he then "shook the pillow a couple of times and got the whole thing off"; that he pulled the plug out of the socket and went to call Dr. Hunt; that the cord was around the baby's arm "because his arm wouldn't pull up when . . . [he] pulled the cord if it hadn't been"; that he was "very sure it was wound around his arm" because he "had to jerk the cord in order to get it off his arm"; that the radio ground wire was on the floor, "just where . . . [he did not] know"; that he had not noticed the exposed parts of the trouble cord; that to the best of his recollection the trouble cord, the cage, the light and the "pile of wire" were at the right of the baby; and that the baby "could turn, but he couldn't go all the way over." At this point Mrs. Noxon stated that the baby would "hold a rattle . . . very tight" as if he was trying to shake it, that he could not shake it enough to make it rattle but he moved his arm the same way. With reference to the time at which the defendant had stated that he left the book room he said that "both of these wires" were on the baby's right; that the only explanation

he could see "is that the baby, in moving his arms, got an arm in the wire there and pulled it up over his chest, and he got his left arm in and got the thing twisted around"; that probably the way he got the current was that "the live part was on top and the other wire was underneath and went through there" (this relative to the burns on the left arm); and that the current might have become grounded in either of two ways, "One, it seemed to . . . [him], from the wires or from the ground aerial wire from the radio. He might have touched that with his arm, or they might have been touching the tray and got a ground through that." Here the defendant recited certain details concerning the examination of the baby by Dr. Smith, his diagnosis and advice, and called upon Mrs. Noxon to "tell from the time . . . [she] brought the baby home" from Dr. Hunt's office. In response Mrs. Noxon stated in substance that after she brought the baby home she took him upstairs so he could have a nap; that he did have a little nap; that she wanted him to wake up enough to have his supper; that she brought him downstairs, put him in the book room, and went out, leaving him there; that she went to the garden to pick corn and brought it back; that she prepared supper for the baby, went into the front hall, and set it down on the stairs to go in and see where the baby was; and that she saw the baby but "didn't do anything." Concerning his conversation with Whittlesey, the defendant stated that he thought that Whittlesey said that one hundred ten volts would not cause a burn because "what would cause the death would be the shock to the heart, and that it was usually people with some kind of heart trouble that would get it." The defendant further stated that "In as far as the wet business goes . . . [he] couldn't help but know that, because you read in the papers every so often about people are always warned in bathrooms not to touch light fixtures"; that in the Cornell-Dubilier case he was trying, which dealt with electricity, he had to make a study to a certain extent, but that he never made any great study; that if he had thought about it he would have thought that, if the tray was grounded to something and

the baby clutched a wire, he would have got more of a shock than if he had been lying on the floor, but that he did not "think putting the baby on the tray itself would have made any difference, unless the tray was grounded"; that if the baby was just lying on the rug he thought the accident would have happened; that he did not unwind the cord that day, it just came unwound; that the end of the trouble cord nearer to the cage was untwisted perhaps for four to six feet; that it unwinds very easily; that the lamp end of the cord was not on the baby's chest but was on the side, and the part around the baby's arm was the untwisted part; that the baby's diaper was wet when he placed him on the tray; and that he knew from talking with Whittlesey that "if you have got a bad heart and you are standing in a bath tub and you get a short circuit" it might cause death from shock. The defendant further stated during the inquiry at the police station that he had said to Chief Sullivan, "Of course I have a motive," that the destruction by him of the trouble cord was the "most foolish thing . . . [he] did because that wire could prove a lot of these things," and that if he "had suspected for a moment that this thing was going to be regarded the way it has . . . [he] would have insisted on the doctor taking the wire with him."

John F. Horgan, a State detective, testified in substance as follows: On the morning of September 27, 1943, he went to the defendant's house with Captain Marcel, Lieutenant Whittemore, Inspector McColgan and Officer Naughton. Photographs were taken and certain measurements were made. The witness noticed a wastebasket in the "master bedroom" in which he found certain scraps of paper with writing on them. He took them downstairs and gave them to Captain Marcel. He had no search warrant. The handwriting on the scraps of paper was admitted by the defence to be that of the defendant. The scraps having been reassembled, omitting words deleted or indecipherable, read thus: "Some time after 5:30 I got out the tubes and brought them with the trouble light to the room. I moved out the radio, connected the light, and put the light on the floor.

Peggy [Mrs. Noxon] brought the baby in as she was going to pick corn. I played with the baby. Then I tried to get some of the tubes aerial and ground connection loose and I had trouble and I went out to the garage to get a screw driver and pliers, and before I left I put the baby on the floor. I put him on the tray that I had the tubes on as he was wet and I thought if he was wet any more tray would catch it. The tray and cord were next to each other. I was gone three or four minutes and when I came back as soon as I went in the room I saw something was wrong with the baby. I pulled and I smelled something burning and part of the cord was over his arm and part under. I pulled it off and pulled the cord out of the socket. I then went into the hall and met Mrs. Noxon coming from the kitchen — and I then called the doctor. On my description diapers were — diapers wet — Dr. England. Do not know where black cord  Think lamp cord on right. Think they twisted around baby's arm. About motive. I suppose I had a motive about mean that when an accident happens to a defective baby parents are suspected  Belchertown — whether to have a nurse or put baby in institution  Cord seen by Dr. England  I wanted to destroy it so it wouldn't be lying around when John or someone else might hurt themselves with it.  1 Whittlesey — wouldn't discuss in front of  2 would have picked a different time  3 wouldn't have told about the tray  4 wouldn't have destroyed cord  5 had brought in tubes and light before Peggy brought baby back  I did not ask her to bring baby and did not know she would bring the baby downstairs  If I knew ground was necessary why did I tell about it. No one would have known  showed breaks which in hasty examination found 3  There might be others  If Peggy believed  1 I did not know baby was to be brought in  2 I was reading paper 5 minutes before she heard me go to the garage  3 I was in garage for about 5 minutes.  4 Soon after she heard the screen slam on my return she came into the room. Size and number of burns.  1. Cord might have been defective in several places so that several charges entered  2 Effect of electric shock might cause either cord or move  Therefore many change

position of baby. 3. Baby could move arms  Shining report  1 had been handling  Dr. H and Dr. England  2 Insulation will break if cord is twisted in hand  3 Cord in garage — doors open day and night  cars washed — heated enough to keep above freezing  4 Hanging from pipe — knotted — extension squeezed up between pipe and ceiling. Dr. Hunt said baby's eyes were better — back strong — would have left baby with cord wrapped arm.  I didn't know baby was to be in the room until Peggy brought him in at which time I had cord and tubes in the room  The maid would be out the next day and I would have picked that day  1 I had brought the tubes and cord to the room before Peggy brought the baby  I didn't know she was bringing baby there until she did  2 There was no need for me to tell about the tray being under the baby.  3 If I had done it I would have made sure that the cord was wrapped around baby arm when the doctor came one burn instead of several  4 I would not have destroyed the cord  5 Picked other day and hour."  (On cross-examination the defendant testified that he made a part of these notes after Dr. England had telephoned on Thursday, September 23, 1943, that he was coming to see him again, and that he made them for the purpose of the expected conference with Dr. England; and that he made the remainder of the notes on Saturday, September 25, after he learned that the district attorney was coming to see him that evening.)

Theresa C. Moss, who was seventy-nine years of age and who was assisting in the housework at the defendant's house on the day of the baby's death, testified that she was in the kitchen on that day from 5 P.M. to about 9 P.M., that she heard the baby cry, he "made a very faint noise," and she said (to herself), "Now if he is crying any louder . . . I will go in, but his father is there, and he will probably take care of it."  There was evidence adduced by the Commonwealth tending to show that the defendant had displayed an affectionate interest in the baby.

On September 27, 1943, the defendant was placed under arrest.  The police had removed the radio, certain wires tied together, a screw driver, three pliers, a bit, and other

objects of personal property, without search warrants. In the course of the interviews of Chief Sullivan with the defendant, Chief Sullivan questioned the defendant as to the necessity of a trouble light for removing the tubes from the radio, pointing out that at the time in question (approximately 5:30 P.M.) the day was bright and sunny and the radio was located at the northeast corner of the book room at one side of the bay windows. A representative of the weather bureau at the Pittsfield airport testified that on September 22, 1943, at 5:30 P.M. the sun was shining, the visibility was nine miles, the temperature was sixty-nine degrees, and the humidity was sixty-eight per cent, sixteen per cent above normal. There was evidence that on a previous occasion the defendant had removed tubes from the radio without the aid of artificial light. At the trial they were so removed by Molleur, a radio mechanic, who testified that on September 25 in the presence of the police he put the radio in operation, that it worked satisfactorily, that thereafter he had inspected the tubes that were in the radio, and that all were in good condition except one that was weak but "not dead." On September 25, 1943, Inspector McColgan, who had gone to the defendant's house with Officer Naughton and Molleur, was approached by the defendant, who said to him, "Inspector, I think that the Noxon family is doomed . . . Look what I've went through, the things that I've suffered . . . look at my father . . . My father was blind for a good many years, and lost his legs. . . . This that the Doctors tell about this baby . . . Sometimes it's more than you can stand."

At this point the evidence may be summed up concerning the construction of the trouble cord, its characteristics with respect to unwinding, and the conclusions to be drawn from the strands of the cord from which the insulation was missing. The plug and socket ends were manufactured by the Monowatt Electric Corporation of Providence, Rhode Island. The wire used was purchased from the General Electric Company. There was a shipment of this type of socket cords to a store of the J. J. Newbury Company in Pittsfield on August 7, 1942. The designing engineer of

the wire, conduit and cable section of the General Electric Company identified the wire attached to the plug and socket ends of the trouble cord as manufactured by that company; and testified that the cord was better than the standard model, that it was of superior type, that it is wound in the manufacture so that the wire "has fight" and tends to wind itself back into place when unwound, and that in his opinion one could not untwist the wire for a distance of approximately six feet from the socket end without removing at least one wire from the socket. This witness in answer to hypothetical questions testified that in his opinion the bare spots on the trouble cord had been exposed by design rather than by wear; that the wire could not be unwound by use and handling; that a break caused by prevulcanization would not be as long as three quarters of an inch; and that the insulation on the trouble cord had been removed by a sharp instrument.

In an intensive preliminary examination as to his qualifications as an expert, Dr. Alan R. Moritz testified that he was professor of legal medicine at the Harvard Medical School, expert assistant in pathology to the department of public safety and consulting pathologist to the department of mental health, associate medical examiner for the county of Suffolk and pro tempore medical examiner for the county of Norfolk, and gave his experience as a pathologist in the matter of autopsies and electrothermal burns. At the conclusion of this inquiry the defendant conceded that Dr. Moritz was qualified as an expert in pathology, and the judge deferred his decision whether the witness was qualified as an expert on electrothermal burns until such time as the witness should be interrogated as to such subject matter. Later when he was so interrogated the judge found that he was qualified to respond. The testimony of Dr. Moritz following the preliminary examination may be summed up as follows: On September 23, 1943, in response to the request of Dr. England, the witness went to the funeral home where the body of the baby lay, accompanied by one of his assistants, Dr. Frank R. Dutra. Dr. Moritz performed an autopsy there on the body of the baby under

the direction of Dr. England and in the presence of Dr. Hughes (associate medical examiner) and Dr. Dutra. The autopsy report was signed by Dr. England as medical examiner. At the autopsy Dr. Moritz and his assistant observed lesions on the front of the left arm beginning at the crease of the elbow and extending down for a distance of about two and one fourth inches in length, and one and three fourths inches in width. The skin was discolored and for an area of about one and one half inches in diameter was destroyed, and the tissue beneath was exposed. Around the central portion of the area it had the appearance of having been cooked and was opaque. This "cooked" area was surrounded by a thin, bright red line. Through the large lesion there were several pairs of parallel lines. In the center of this lesion tissue had been destroyed to the extent of about an eighth of an inch below the skin. On the back of the left arm of the baby, approximately an inch above the wrist, they observed a dumbbell shaped lesion consisting of two areas of discoloration about one inch apart connected by two red wavy streaks. On the inner right forearm of the baby, at about the middle, there was a discolored area, at the top of which there were two small marks "shaped like inverted T's." A short distance below were two other marks shaped like exclamation points. Below these was a single mark, the largest of all. Below that was a reddish brown line of discoloration in three segments. Photographs of the various lesions that had been taken were introduced in evidence. The lesions on each arm were excised at the autopsy and taken to Boston for laboratory analysis. Microscopic examinations and slides of the lesions excised from the arms of the baby were made. They were introduced in evidence. Dr. Moritz testified that the small marks like exclamation points were little holes that extended through the skin, extending certainly below the top layer (the epidermis), that below was the single mark, the largest of the group (which had the same characteristics), that the red or brown line below, at first thought to be a scratch, was slightly depressed, that the skin under it was depressed and discolored. The witness

also testified that the central large lesion on the right arm indicated contact with the end of a slender electrode that had penetrated the epidermis; that the two "exclamation point shaped" marks just above that central lesion had to the naked eye essentially the same appearance; that the lower linelike lesion was also a burn of a type that could have been produced by the movement of a pointed electrode in a linear fashion down the surface of the forearm or by contact with a linear or wirelike electrode; that the "exclamation point like marks" show punctures of the skin and that they were produced by the point of an electrode that remained in a position long enough to produce burning so that the tissue had become engorged and gave the linelike burn the red color; and that there was no burning associated with the uppermost lesions (the punctures made by the Schick test). The witness also testified that in his opinion different kinds of electrical contacts were responsible for the burnings on the two arms. He could recognize electrode contacts on the left arm like the side of wire. Shown the ground wire and his attention having been directed to the two copper wires projecting at one end, the witness testified that he believed that "either of these projecting ends of copper wire could produce lesions similar to some of those" that he had described in the right arm. The witness further testified that electrodes applied to the left arm charged with electricity were in his opinion an adequate cause for lesions on that arm, and that the dumbbell burn could have been produced by contact with the side of wire or wires that were carrying an adequate amount of electricity. (There was evidence that the baby's diaper at the time of his death was fastened on each side just above the hip by a safety pin, and that the contour of the burn resembled that of a safety pin.) The witness further testified that with a current of between one hundred ten and one hundred twenty volts, the regular household current, a period of time in excess of fifteen minutes would probably be required to produce a lesion as large as he saw on the baby's left arm. The witness was of opinion that, had the trouble cord been applied to the left arm of the

baby for a period that would produce the lesions, the bared parts of the two strands of the cord would be tarnished and that pieces of cooked flesh would have adhered to them, but that in the condition existing after the death, namely, that the bared spots were bright and shiny and the wires were clean, he would be of opinion that the left arm had not been burned by such contacts, and that the current that would flow between two contacts of the bared wires would flow simply through the skin and flesh of the arm between the electrodes.

Dr. Moritz also testified that the baby "died of acute failure of the heart, induced by the passage of an electric current through the chest from forearm to forearm."

The testimony of Dr. Joseph T. Walker, State chemist, may be summed up as follows: He found small quantities of urea, a large component of urine, but also found in human perspiration, on the top and bottom of the cushion that had been removed from the chair upon which the baby was resting before being placed on the tray by the defendant. Small quantities of urea were also found by him on the cover of the pillow which the defendant had said he placed beneath the baby's head and shoulders on the tray, and on the rug. There was not enough urea on the rug to justify a conclusion that there was urine thereon. He found streaks of copper on the bottom of the tray which were caused by dragging some narrow copper object across the bottom of the tray. In two or three of those streaks there was indication that the narrow copper object was composed of several fine members. In the opinion of the witness the copper wires protruding from the ground wire could have caused the streaks. There were other marks of copper, not streaks, which were caused by the tray resting on a copper object. They might be consistent with lying on a long wire, or with lying on the edge of something having copper in it. The witness made a spectrograph test of the skin from the large lesion excised from the baby's left arm. A sample of control skin from that arm showed the normal amount of copper therein. A sample from the control lesion on the baby's left arm showed a greater

amount of copper than is present on normal skin. It was not entirely surface copper. It was copper that was down in the flesh, which got there by such means as electrical conduction or by saturation of the skin with copper. In that lesion the witness' also found lead and tin present. The copper wires tied with a string thàt were taken from the defendant's house had a coating of tin. A spectrograph of the so called dumbbell lesion on the left forearm showed more copper than the normal amount. There was no copper deposit on the surface of the skin as one would find had the burns been due to arcing. Arcing as distinguished from contact is the passage of electricity between two conductors through the intervening space and by means of vaporized metal between the two conductors. Copper was found on the cutting edge of tin snips taken by the police from the defendant's home. Copper was also found on the cutting edges of two pairs of the pliers and on the tip of the screw driver. The witness testified that he found no copper on the insulation on the garage water pipe over which the defendant had stated the trouble cord had been hanging, but later testified that there were pin point deposits of copper on the insulation which could have been caused by copper bearing dust settling on the insulation. In conclusion, the witness testified that the scratches on the bottom of the tray were not deep enough to reach copper therein but must have been caused by rubbing copper wire on the tray.

One McEachron, an electrical expert, testified that in his opinion the baby could not have been burned by arcing with a wire such as that described as the trouble cord.

The Commonwealth having rested, Dr. Milton Helpern, deputy chief medical examiner in the borough of Manhattan in the State of New York, who qualified as an expert on electrothermal burns, was called as a witness by the defendant. He testified in substance that he had examined the skin and slides in the possession of Dr. Moritz; that the large lesion on the left arm could have been caused by a current flowing between the two bare spots on the trouble cord; that the dumbbell burn on the dorsal side of the left arm could have been caused by that arm resting on the

diaper and safety pin (by which it was fastened at the side above the hip); that, examining the photograph of the baby's left arm, he found at least thirty punctate marks on the back of that arm; that these could have been caused by sparks; that contact must have been very short to have produced that kind of burn; that in his opinion the wires carrying the current were moving at some time on the surface of the left forearm; that the punctate burns on the right arm could have been caused by the baby moving that arm over to the left arm and coming in contact with the wire so as to receive burns by sparks; and that all the burns except the dumbbell burn could have been caused by the trouble cord and could have taken place in a period of three to five minutes. On cross-examination the witness testified that the dumbbell burn could have been made by contact with the safety pin pinned through the diaper; that he saw on the photograph (of that burn) what he considered a gap one eighth or three sixteenths of an inch long; that he thought the gap in the burn might be smaller than the space in which the safety pin went through the folds of the diaper; and that, if the ground wire came in contact with the tray, that would complete the circuit from the left arm to the right arm. The witness further testified that the baby could get punctate burns from application of the ground wire to the right arm while the current was applied to the left arm, but qualified that in redirect examination by stating that all the burns on the right arm could have been caused by the passage of the current. He also testified that, if the wires described (the trouble cord) caused the burns, he would expect the exposed parts of the conductors to be dull afterwards unless the deposit of dried skin and tissue fluids which he would expect to find were rubbed off.

The witness had been shown a safety pin by defendant's counsel which was marked for identification. The witness was permitted to compare the safety pin with the photograph of the dumbbell burn. The judge refused to permit the jury to measure the pin with the photograph of the dumbbell burn in question, but stated that they would have plenty of time to place the pin upon the photograph "when

they retire." This subject will be dealt with later in the consideration of the defendant's assignments of error concerning questions asked the witness on cross-examination. It may be added that no contention was made that the safety pin exhibited to the witness was one by which the baby's diaper was in fact fastened at the time of his death.

Alston A. Tillou, general foreman of the power transformer testing section of the General Electric Company at Pittsfield, testified in substance as follows: As part of his duties he investigates electrical accidents, including those from household current, and has observed burns in those cases. The burns on the baby's right arm described as punctate burns are electrical burns. They are about one thirty-second of an inch in size. Such burns "vary to the extent of the electrode" with which the victim had come in contact. If a person was well grounded and a wire came in contact with his arm, he might receive one or two little perforations in the skin. The witness found twenty-four of such marks around the dumbbell burn, and concluded that they were caused by a wire in a moving contact, or from a spatter of molten metal resulting from an instantaneous short circuit. He thought that the dumbbell burn could well be the image of a safety pin, and outlined the circuit as "from the one wire contacting the left arm down through the forearm to the safety pin, through the diaper, wet diaper, to the body, upward through the body to the shoulder and back to the other electrode." On cross-examination the witness testified that both wires (both conductors of the trouble cord) would have to touch the skin and that he did not feel that the insulation on the wire would prevent the bare portions from coming in contact with the arm and causing the burn.

Dr. Charles C. Lund had specialized in surgery but for the last two years had been concentrating all of his research time in study and writing on the subject of burns. His testimony may be summed up thus: The average thickness of the epidermis of a six months old child is one four-hundredth of an inch. The salty fluid surrounding the cells of the skin is a very good conductor. The corium (or cutis

vera) and all tissue underneath carry electricity with ex-
treme ease; the substance used in Schick test fluid makes it
a good electrolyte; urine is a good electrolyte.  He had
examined the tissue removed from the baby's arms and
was of opinion that the burns on the left arm were caused
by the exposed spots of wire (the trouble cord) coming in
contact with the skin, and that the wires moved during
the burning; that after the initial burning the epidermis
was broken and the resistance of the skin lowered; that
the burning observed could have been produced in a very
short time, within a minute or more; and that it would
cause pain which might cause the baby "to bring the other
arm over to brush this cause of pain away." On cross-
examination he thus explained the burns on the baby's
right arm, but also stated that, presupposing that the two
wires of the trouble cord were separated and that at a given
moment the opening on one of those wires was in contact
with a thoroughly wet area on the diaper and then contact
came with the other one in the position now shown by the
pictures of the burns on the right arm, a momentary cur-
rent passing from the wet diaper to the buttock through
the body and out to the right arm could cause the burns
in the right arm.  This witness finally expressed the opinion
that the exposed ends of the ground wire, if they came in
contact with the right arm of the baby, could cause the
punctate burns, the exclamation point like lesions on that
arm, that there would be contact there through a point of
low resistance.

Stephen E. Whiting, an electrical engineer, testified that
"if you have a small contact you would expect a higher
[skin] resistance"; that "the more pressure you have"
the less resistance; that if there was no contact with the
skin, he would not expect a flowing of current; that the
presence of the insulation and the absence of pressure
would tend to prevent a contact from forming; that tak-
ing the skin resistance at two hundred ohms, the net result
of the current going through the arm, body and buttock
and safety pin was two one-thousandths of an ampere; that
it would take a long time to produce such a burn as ap-

pears on the big lesion on the baby's left arm, but with moisture the breaking down of the skin would be rapid and the burns produced in a minute; that he did not know what the skin's resistance was; that with respect to the time necessary to produce the big lesion it could start with a minute or one day or any indefinite period; and that the dumbbell lesion could have been caused by the (left) arm's contact with the safety pin in the diaper.

Charles J. Umberger was a chemist and physicist. He testified in substance that he had examined a certain spectrograph plate in evidence; that there was copper present in all of the skin spectrum; that the concentration of copper in the skin from the burned areas is greater than that found in normal skin; that there are weak lines which could be tin, lead or many other elements; that tin and lead and other metallic elements are found in normal human bodies; that the dumbbell burn showed copper; and that the burns on the right forearm showed copper.

William J. Barrett, a chemist, testified that a weak tube in the defendant's radio in question would cause serious distortion.

The defendant testified in direct examination concerning his education, his service in the first world war and consequent illness as a result of having been gassed, his physical difficulties by reason of having been stricken by infantile paralysis, his father's disabilities, and the discovery that the baby was of the Mongoloid type. In the matter of the circumstances attendant upon the death of the baby, he denied having stated that the trouble cord was resting about a foot from the tray on which he had placed the baby. He testified that while waiting for Dr. Hunt to come he noted the bare spots on the trouble cord; that he had never noted them before; that he taped the bare spots "that night," but later cut off the plug and trouble lamp before putting the cord in the incinerator; that the cord was not frayed; that the separation of the conductors occurred one day when he put his cane in a loop of the cord to remove it from the pipes over which it was hanging in the garage and the wire became detached from the socket; that he had not noticed

the separation of the conductors until Dr. England was examining it; that the notes he prepared before the district attorney and Chief Sullivan visited him on the following Saturday were prepared after he had been accused of murdering the baby; that on the previous Thursday when the "Pittsfield Electric people came" he had asked one of them "Could it have come from one wire touching one arm and the other wire touching the other arm," and that the reply was "Yes." Before the conclusion of his direct examination he testified that he told Chief Sullivan that "the wire was not tightly wound around. It may have been around the arm." The defendant also testified that he did not give permission for the performance of the autopsy. Concerning the notes that the defendant had made prior to the second visit of Dr. England and prior to the visit of the district attorney, the defendant testified that on Sunday evening (September 26, 1943) he changed his suit of clothes and took the notes out of his pocket, tore them up, and threw them in the waste basket, where they were subsequently found by the police.

The testimony of the defendant on cross-examination may be summed up as follows: He did not tell Captain Marcel that the trouble cord was a foot from the tray on which he had placed the baby. He admitted his conversation with Whittlesey concerning the voltage commonly used for domestic purposes. Questioned with respect to whether he had bought a trouble cord other than that which he had testified had transmitted the electric current to the baby's body, he testified that he had never bought another "trouble cord." Questioned at length, he testified that he had bought an "extension cord," but that he did not know where or at what precise time. He did not recall buying one at Kresge's within two weeks of the baby's death. He bought an extension cord in the summer of 1943 to replace a cord in a soldering iron which was too short. The extension cord purchased had a plug at one end and a three way outlet at the other end. He was willing to produce the soldering iron. He took the three way outlet off the extension cord, not the plug. He was trying to solder a "clip."

He recalled seeing the soldering iron on the work bench in the garage when the police came. Five feet of the outside cover of the extension cord nearest to the soldering iron are "gone and missing." The soldering iron at one end of the extension cord is made of nickel copper. "Copper is attached to a piece of nickel tube, and there's a wooden handle" through which the extension cord goes into the tube. Subsequently the soldering iron with extension cord and plug attached was produced by the defendant, and he testified that he loosened the covering of the extension cord to get at the two wires, that in pulling it through the wooden handle it bunched up, that he pulled off perhaps a foot or two, that there was enough bare wire then, "a small amount," to attach to the heating element, and that he did not test the soldering iron with the new extension cord, "never tried it." He further testified that Mrs. Noxon did not bring the baby down to the book room until between 5 and 5:30 P.M. on the day of the baby's death. That is in accord with the defendant's notes to the effect that he brought the trouble cord into the book room at about 5:30 P.M. The defendant further testified that he did not know how the trouble cord was on the baby's left arm; that he pulled the trouble cord out of the (wall) receptacle; that he did not know whether he put the plug back in the receptacle; that he did not know anything about electricity and did not know the voltage in the house; that he did not know what wires had to be grounded; that his idea of grounding was that current has to go in one wire and out another into somewhere else; that he did not know what a ground wire is for on a radio; and that he did say at the police station that house current might have grounded in either of two ways, "one, it seemed to . . . [him], from the wires or from the ground aerial wire from the radio. He [the baby] might have touched that with his arm, or they might have been touching the tray and got a ground through that." He further testified that the notes that he had made on Saturday were of various points that he wished to discuss with the district attorney but that he did not discuss any with him when the district attorney visited

him that evening. He later testified that he had an idea that under right circumstances one hundred ten volts would produce death.

Moving pictures of the baby, taken in July, 1943, and produced by the defendant, were exhibited to the jury for the purpose of showing the motion of the baby's arms, legs and body, the lifting of his head, the raising of his elbow, the length of his arms, and the width of his chest.

The defendant having rested, the Commonwealth called as a witness Ida L. Royce, whose testimony may be summed up as follows: She had been employed at Kresge's store in Pittsfield from the second week in August, 1943, until February, 1944. Sometime between one and two weeks prior to the defendant's arrest, he entered the Kresge store, asked for an electrical cord, selected one, paid for it, put it in his pocket, and departed. The witness made the sale. The cord had a plug on one end and a socket on the other. Mary L. Faucher, also called by the Commonwealth, testified that she was employed in the Kresge store in September of 1943, and that the defendant, whom she recognized, entered the store in that month about a week before the baby's death was reported in the papers.

Recalled by the Commonwealth in rebuttal, Captain Marcel testified that on September 27, 1943, he was in the defendant's garage and made a search in the vicinity of the work bench and of the tool box on the wall, and that there was no soldering iron there. (The defendant had testified that it was there.) Inspector McColgan and Officer Naughton, having been recalled by the Commonwealth in rebuttal, testified that they too were in the garage with Captain Marcel on September 27 and searched the work bench and the tool box and that the soldering iron was not in either place and that they found none in the garage. One Durrell, foreman of the cord set division of the Monowatt Electric Corporation, called by the Commonwealth, was shown the cord that was attached to the soldering iron, identified it as having been manufactured by the Monowatt corporation, and testified that as manufactured the cord was twelve feet two inches long with a three way outlet at one end

and the plug at the other. Taking the soldering iron apart, the witness, having measured the cord, testified that it was eleven feet two and one half inches long from where it was connected to the soldering iron leads and the cap, and that there is approximately one half to three quarters of an inch of the cord in the plug. About nine inches of the cord as sold to the defendant were missing.

Dr. Moritz, having been recalled by the Commonwealth, testified that there was no gap in the "linear lines" of the so called dumbbell burn, that the lines were continuous from end to end of the lesion. Dr. Dutra, who had excised the lesions on both arms of the baby at the autopsy, testified in like manner. Dr. England, having been recalled, testified that there was no gap in the two linear lines connecting the ends of the dumbbell lesion. Dr. Hunt, recalled, testified that in his opinion the baby would not have a natural reflex protective action which would cause him to reach for the source of the pain, that a baby of his age could not locate pain in his left arm, and that the length of the forearm of the baby was such that the only possible way that those two lesions (that on the right arm and that on the left arm) could be brought together was by crossing the arms and holding them there. Dr. Walker, having been recalled, testified that he made a test of a safety pin that had been produced by the defendant during the trial as one similar to that toward the left on the baby's diaper, and that it was a common steel pin which appeared to him to have a common zinc coating. As before noted, there was evidence that there were traces of copper in the dumbbell lesion.

During the closing arguments in the court below, the Commonwealth stressed that the conductor through which the current that killed the baby flowed was the extension cord purchased by the defendant a week or two before the baby died. On the other hand, the defendant insisted as from the beginning that the conductor was the trouble cord. These contentions were not evidence, and it was for the jury to draw their own conclusion from all the evidence itself as to the manner in which the baby met his death, whether it

was caused by accident or by the deliberately premeditated action of the defendant with malice aforethought.

In the consideration of the evidence the jury were not obliged to accept or reject statements made by the defendant in their entirety, but could give credence to such portions thereof as they deemed trustworthy. *Commonwealth v. Goldenberg*, 315 Mass. 26, 30.

There was evidence that would have warranted the jury in finding that on August 13, 1943, Dr. Hunt talked with Mrs. Noxon about the baby's condition and "as to what should be done and who should be consulted"; that within a few days thereafter the defendant called on Dr. Hunt and wanted to know "what the story was about the baby's condition" and why Dr. Hunt wanted him to go to Boston for a consultation; that Dr. Hunt told him that he considered that the baby was not right mentally; that as a result the baby was taken to the Children's Hospital in Boston and examined by Dr. Smith, who reported to the defendant and his wife on August 26 that the baby was of the Mongoloid type, and advised them of his probable unfavorable progress as already set forth above in the summary of evidence. The jury could have found that in the early part of September the defendant talked with Whittlesey, the vice-president of the local power company, and questioned him with respect to the voltage of electrical current supplied to dwellings for domestic purposes; that Whittlesey told him that the voltage in houses in the vicinity was one hundred ten to one hundred fifteen; that referring to an accident reported by a Springfield newspaper in the issue of August 20, 1943, in which a woman was "nearly electrocuted" when, while taking a bath, she attempted to disconnect the cord of an electric heater, the defendant queried Whittlesey concerning whether such an accident could prove fatal "in a residence from the service that is usually supplied"; that Whittlesey, as before set forth, answered, in substance, that if a person was standing upon a damp floor or was in contact with some other ground and came into contact with a defective conductor of electricity the result might be fatal, that the heart might be a contributing cause. The jury could

have found that the potential of the electric current in the
defendant's house was one hundred eighteen volts; that he
knew that in order for a contact with a defective conductor
of electricity to be injurious or fatal there must be a ground
or a completed circuit and that a ground could be created if
one were standing or resting on a surface that was grounded
particularly if it was damp or wet; and that he also knew
that the ground wire which had been disconnected from the
radio would serve to establish a ground and cause the cur-
rent to flow if that wire came in contact with the tray on
which the baby was resting or with the baby's body.   The
jury could have found that on the day the baby died there
were conductors of electricity in the possession of the de-
fendant that were efficient to cause the baby's death if a
current of electricity of the voltage supplied to his house
passed through them into the body of the baby while the
baby was also in contact with a ground.   While the jury
were not obliged to find the precise conductors with which
the baby came in contact, the evidence would have war-
ranted them in finding, if they chose, that the so called
trouble cord was the lethal instrument.   They could have
found in reliance upon the notes made by the defendant
that he brought that cord with plug and lamp attached
into the book room about 5:30 P.M.; that the baby was
there at that time, having been brought into that room by
Mrs. Noxon at about that time; that there were bare spots
opposite each other on the two wires of the trouble cord;
that the insulation had been removed from those spots by
design; that the defendant removed the baby from the chair
in which he had been resting and placed him with his but-
tocks on the metal tray on the floor; that his diaper was wet
to the defendant's knowledge; that a ground was established
by the ground wire coming in contact with the tray or the
baby's right arm; and that very shortly thereafter the
baby died.   The jury could have found that no one other
than the defendant entered the book room between the time
the baby was brought there and the time he died; that when
the defendant "smelled something burning" and lifted the
cord, it was wound or wrapped around the baby's left arm;

and that it would have been physically impossible for the baby to lift the cord with the lamp and cage attached and to wind or wrap it around his left arm. They could have found that the major burn on the left arm was extensive and deep, that elements of copper were embedded in it, and that the burn was caused by contact with the exposed wires of the trouble cord resting upon that arm. They could have found either that the punctate burns on the right arm were caused by the passage of electricity from the left arm through the chest and down through the right arm, or that they were caused by the exposed end of the ground wire. While there was much evidence of a highly technical nature concerning the length of time that it would take to produce the major burn on the baby's left arm if the trouble cord was the lethal conductor — at least fifteen minutes if Dr. Moritz's opinion was adopted by the jury, or two or three minutes if they chose to accept the opinion of expert witnesses called by the defendant — all that evidence bore most materially on the credibility of the defendant's statements concerning leaving the room after he placed the baby on the metal tray and concerning the time in which he was absent before discovering that the baby had been electrocuted. The fundamental fact, however, was that the baby had been killed by the passage of electricity through his body, and the jury could find, without regard to the time it had taken to produce the major burn, that it would have taken but seconds for the current to penetrate the skin and tissue beneath, and that the baby died almost at once when the contact was established between the electric current and his body.

The jury were not required to find that the so called dumb-bell burn with parallel lines in the form of a safety pin on the back of the baby's left forearm was caused by the laying on of two fine wires charged with electricity and exposed for over an inch in length. On the evidence they could choose to believe that that burn was caused by the electric current coming in contact with the safety pin by which the baby's diaper was fastened above his hip on his left side. But if the jury did find in fact, as they could if they chose to believe certain witnesses, that the burn under discussion was caused

by contact with lethal conductors other than the trouble cord, they could have concluded properly that such other conductors were placed upon the baby's left arm by the defendant with deliberately premeditated malice aforethought. They could have discredited the defendant's statement to the effect that he brought the trouble lamp into the book room with the purpose of removing the tubes from the radio and inserting new tubes, since there was evidence to warrant a finding that the light of day shining through the windows beside which the radio stood was ample for that purpose. The jury could have found that, following the expressed opinion of Dr. Hunt that the baby "was not right, mentally," and the unfavorable report of Dr. Smith, the defendant was greatly upset, that he was brooding upon the physical ills which he suffered, those that beset his father, and those that were afflicting the baby, and that referring to them shortly after the baby's death he had stated that he thought the Noxon family was doomed and that "Sometimes it's more than you can stand." The jury could have inferred consciousness of guilt from the action of the defendant in burning the trouble cord and the baby's diaper and shirt on the evening of the day the baby died, from his action in making the notes set forth before when Dr. England notified him on the morning following the baby's death that he was coming to see him again, and from his action in making the notes on the following Saturday when advised that the district attorney was going to call upon him that evening. They could have found from his statements to the police and from the notes made by the defendant that he was conscious that he could have had a motive for murdering the baby. The jury could also have drawn an inference from the failure of the defendant to call his wife as a witness in his defence that if so called her testimony would be unfavorable to him. The jury could have found that she was available. "Where the circumstances are strong against the defendant and it becomes a question what weight shall be given to them in view of any conceivable explanation of them, if there be witnesses who could furnish any such explanation and they are peculiarly under

the influence of the defendant or peculiarly related in interest to him, then his failure to produce any such witness is a proper subject for comment unfavorable to him. . . . A failure to explain what can be reasonably explained may be taken as evidence that the truth would not help the defendant. The jury are to judge whether the defendant has done what he could to put the evidence before them and what weight should be given to his failure." *Commonwealth v. Spencer,* 212 Mass. 438, 450–452. The privilege to refuse to testify was Mrs. Noxon's.

Applying to the evidence the principles of law governing the weight to be given to circumstantial evidence, concerning which the jury were fully and accurately instructed by the judge (see *Commonwealth v. Webster,* 5 Cush. 295), they properly could have concluded beyond a reasonable doubt that the baby's death was not accidental but was caused by the defendant with deliberately premeditated malice aforethought. There was no error in the denial of the defendant's motions for directed verdicts of not guilty.

We proceed to the consideration of the other assignments of error that have been argued by the defendant. See *Commonwealth v. Dyer,* 243 Mass. 472, 508; *Commonwealth v. Congdon,* 265 Mass. 166, 168; *Kay v. Audet,* 306 Mass. 337, 338.

Assignments of error 1, 4, 5 and 51. Assignments 1, 4 and 5 are based upon exceptions to the denial in whole or in part of motions of the defendant for permission to examine certain personal property belonging to him in the possession of the police and certain tissue removed from the body of the baby, together with photographs and microscopic slides thereof, and to make such tests of the tissue as the defendant's experts might deem necessary, for information as to the arm from which the tissue was taken, and that the defendant be furnished copies of the stenographic record of the formal statements made by the defendant and his wife at the police station, of the pathological diagnoses prepared by the physicians who were present at or performed the autopsy, and of the medical examiner's report. One of these motions was made

before indictment and the others were made before trial. The judge did not err in these matters. It was within his discretion to grant or deny the motions. The motions were not for a bill of particulars but were rather an attempt to compel the Commonwealth to disclose, in part at least, the evidence on which it relied. "There is no rule of law which requires the Commonwealth to do that, or which gives a defendant the right to ask it." *Commonwealth* v. *Jordan,* 207 Mass. 259, 264–265. See also Wigmore on Evidence (3d ed.) § 1863. Assignment 51 concerns an exception to the admission of testimony by Dr. Moritz that certain slides of tissue taken from the baby were discarded by the witness as unsuitable for microscopic examination. The defendant argues that he was deprived of the right to observe the actual samples of tissue taken from the baby. This assignment is disposed of by what we have said just above. It may be added that the subject matter of discarded slides was opened up by the defendant. There was no error in the admission of this testimony.

Assignments of error 2, 3, 6, 7 and 8 concern the defendant's exceptions to (1) the denial of his motion to quash the indictment; (2) the granting of his motion for a bill of particulars only as to count 1; (3) the denial of his further motion to quash the indictment on the ground that the first count "does not, in connection with the bill of particulars," set forth sufficiently the act constituting the crime, or "the time, place, manner and means by which" it was committed, and does not fully and substantially describe the crime; (4) the denial of his motion for further particulars; and (5) the denial of his motion that the particulars furnished by the Commonwealth with reference to count 1 be adjudged insufficient and that the indictment therefore be dismissed. There was no error as to these matters. The first count of the indictment was in the statutory form, G. L. (Ter. Ed.) c. 277, § 17, and set forth the time and the place of the alleged crime. As affected by the particulars furnished by the Commonwealth, it became in substance the same as the second count. The time and the place of the alleged crime were set forth, and the manner in which the

murder was alleged to have been committed was described as assaulting and beating the victim with intent to murder him by causing a current of electricity to pass through his body until he was dead. The defendant was thus furnished ample information as to the nature and grounds of the crime with which he was charged. The offence charged was "fully and plainly, substantially and formally, described to him" as required by art. 12 of the Declaration of Rights. G. L. (Ter. Ed.) c. 277, § 40. The defendant had the benefit of particulars that were fully as complete and detailed as were necessary for compliance with the Constitution or for fairness to him. "Beyond that the requirement of particulars or specifications was discretionary." *Commonwealth* v. *Welansky*, 316 Mass. 383, 395–396, and cases cited. See also *Commonwealth* v. *Lammi*, 310 Mass. 159, 161; *Commonwealth* v. *Hayes*, 311 Mass. 21, 25.

Assignments of error 9 to 13, inclusive. By assignments 9 to 12 the defendant attacks the findings of the judge that jurors Chittenden, Johnson, Brown and Kelly stood indifferent. No exception, however, was taken by the defendant as to these matters. As to assignment 13, the exception taken by the defendant during the examination of the qualifications of juror Chittenden on the ground of misnomer was waived by him before the judge found that Chittenden stood indifferent. It follows that the defendant cannot now be heard to complain of the seating of these jurors. See *Commonwealth* v. *McDonald*, 264 Mass. 324, 336; *Commonwealth* v. *Zelenski*, 287 Mass. 125, 128.

Assignments of error 15 to 20, inclusive, 48, 49, 50, 66 and 73. We consider these assignments together since they are all based on exceptions to the admission of certain enlarged photographs and negatives of the baby's arms, of a photograph of the book room in the defendant's house, of photographic enlargements of specimens of skin on the baby's arms, and of photomicrographs of a cross section of skin excised from the baby's arm. The admission of these photographs was not erroneous. It is settled that the admission of photographs in evidence rests largely in the discretion of the trial judge, *Commonwealth* v. *Gray*,

314 Mass. 96, 98, and cases cited, and that whether the photographs are sufficiently verified is a preliminary question of fact to be decided by him. *Everson* v. *Casualty Co.* 208 Mass. 214, 220, and cases cited. As to the enlarged photographs, the judge properly could and did find that they had been sufficiently verified and were fair representations of the subject matter, and that they might aid the jury in understanding the issues. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 470–471. *Commonwealth* v. *Venuti*, 315 Mass. 255. *Commonwealth* v. *Jones*, *ante*, 228. As to the photomicrographs, there was evidence of their trustworthiness, and the judge was so satisfied. It follows that these photomicrographs of the image recorded were admissible. Wigmore on Evidence (3d ed.) § 795. The photograph of the book room was properly admitted in evidence, *Commonwealth* v. *Robertson*, 162 Mass. 90, 97, *Commonwealth* v. *Tucker*, 189 Mass. 457, 476; and the judge before admitting that exhibit pointed out to the jury that the photograph did not purport to represent the condition of the room at the time of the baby's death (September 22) but merely represented its condition when the photograph was taken on September 25. Assignment 20 is based on exceptions to statements made by the district attorney in passing the photograph of the book room to the jury. This assignment is without merit. The district attorney merely identified the objects that appeared in the photograph.

Assignments of error 23, 32, 37, 43, 44, 46, 52, 53, 54, 56, 57, 60, 62, 67, 68, 69, 70, 71, 72, 74, 75, 76 and 89. Assignments 23, 32, 37, 43, 44, 46, 56, 57, 60, 62, 67, 68, 69, 70, 71, 72, 74, 75, 76 and 89 are based on exceptions to the admission of certain hypothetical questions on the ground that certain questions were based upon insufficient facts or that they were framed in anticipation of the defendant's evidence, or that the form of certain questions was improper, or that the subject thereof was one for the jury. Some of these assignments are based on exceptions to the refusal of the judge to grant the defendant's motions to strike out certain answers or parts of answers to hypothetical questions as not being responsive. We have ex-

amined the assignments just referred to and discover no error. The "usual practice is to allow counsel in framing a hypothetical question to assume the existence of such facts and conditions as the jury may have a right to find upon the evidence as it then is, or as there may be fair reason to suppose it may thereafter appear to be." *Anderson* v. *Albertstamm*, 176 Mass. 87, 91. *Commonwealth* v. *Tucker*, 189 Mass. 457, 477. If the presiding judge "thinks that the jury will get more help upon a matter which is the subject for expert testimony, by allowing the expert to give his opinion upon separate matters than by answering a hypothetical question involving all the facts in the case, it is within his discretion to do so." *Greene* v. *Boston Elevated Railway*, 207 Mass. 467, 477. And it is open to the other party to show on cross-examination of the expert that there are facts in the case not accounted for in the opinion of the expert. *Phillips* v. *J. H. Lockey Piano Case Co.* 205 Mass. 59. In determing the scope and fullness of hypothetical questions, much must be left to the discretion of the trial judge which will not be reversed where it does not clearly appear to have been wrongly exercised. *Commonwealth* v. *Cheng,* 310 Mass. 293, 297–298. In the instant case that does not appear, and it is appropriate to observe that the judge instructed the jury with great care on the subject of hypothetical questions, pointing out to them that in the consideration of such evidence it was their province alone to determine whether the facts assumed in such questions had been established and that, if they had been established in substance, then and not until then could the value of the expert evidence be taken up by them. That is settled law. *Commonwealth* v. *Russ*, 232 Mass. 58, 73. With respect to the motions to strike out before referred to, we have examined the questions and answers involved and are of the opinion that the answers were responsive and were allowed to stand properly. Assignments 52, 53 and 54 are based on exceptions to the admission of certain testimony of Dr. Moritz having to do with electrothermal burns. The main contention of the defendant is that Dr. Moritz was not qualified as an expert on

electrothermal burns. In the summary of evidence we have already stated that an intensive preliminary examination was had as to the qualifications of Dr. Moritz as a pathologist and as an expert on electrothermal burns, an examination in which the judge, counsel for the defendant and the district attorney participated. It would serve no useful purpose to recite the details of his education and experience there brought forth. Whether he was qualified to testify as an expert on electrothermal burns was a preliminary question for the judge, the determination of which rested largely in his discretion. *Commonwealth* v. *Bartolini*, 299 Mass. 503, 513 (certiorari denied sub nomine *Bartolini* v. *Massachusetts*, 304 U. S. 565). Since the evidence does not show that his decision was erroneous but rather supports a conclusion that it was right, no error is shown by these assignments. *Commonwealth* v. *Dawn*, 302 Mass. 255, 258-259, and cases cited.

Assignments of error 25 to 28, inclusive, 58, 77, 87 and 88. Assignments 25 to 28 and 58 are based on the defendant's exceptions to the admission in evidence of parts of insulation removed from a water pipe in the defendant's garage, three insulation bands, two rolls of tape, a screw driver, a pair of tin snips, several pairs of pliers, two rubber insulated wires tied together, also taken from his garage, and certain pieces of paper taken from the defendant's house and pieced together and photographic enlargements thereof. All of these articles were removed by the police without a search warrant. With the exception of the insulation, the defendant concedes that those objects of personalty could be admitted properly in evidence even though illegally obtained, but argues that they were not admissible because not connected with the defendant or the crime. We do not concur. "Articles found at the scene of a crime or in the home of a defendant, or which can be traced to the possession of a defendant and are material to an issue, have been frequently admitted in evidence." *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 470, and cases cited. *Commonwealth* v. *Parrotta*, 316 Mass. 307, 313. In the instant case the articles of personalty

described above were found in the defendant's garage, and he had testified that before the baby died he had gone to the garage to get some tools. The wires were admissible as objects in the possession of the defendant susceptible of use for the transmission of electricity. *Commonwealth v. Brown*, 121 Mass. 69, 81. The pieces of paper (the notes made by the defendant) were admitted properly as admissions. With respect to the parts of insulation, the defendant contends that they are severed realty and that the rule in this Commonwealth of admissibility of illegally obtained personalty does not apply to severed realty. Assuming without deciding that the insulation removed was in fact part of the realty, we think that the rule is the same. The persuasive reasoning in *Commonwealth v. Wilkins*, 243 Mass. 356, 358, 359, based upon the authority of many decisions of this court, need not be repeated here. It is applicable to severed realty as well as to personalty. See Davis, Trial of Samuel M. Andrews, 66, 67 (1868). Assignment 77 is based on the exception to the admission in evidence of the soldering iron and cord attached, produced by the defendant at the request of the Commonwealth in the course of cross-examination. Assignments 87 and 88 are addressed to the denial of the defendant's motions that this exhibit and the two insulated wires before considered, together with all testimony concerning the same, be withdrawn from the jury. There was no error as to this subject matter. There was evidence that these exhibits were instrumentalities in the defendant's possession prior to and at the time of the baby's death, and that they were capable of the transmission of electricity. This evidence tended to show that the defendant had the means and the opportunity to commit the crime charged. See *Commonwealth* v. *Brown*, 121 Mass. 69, 81.

Assignments of error 29, 30, 31 and 42. These assignments are addressed to the defendant's exceptions to the admission of a conversation at the defendant's house between a law partner of the defendant and police officers who were seeking permission to take certain photographs of the defendant's premises and to remove some articles of

property therefrom, and who testified that in the course of the conversation the defendant's partner said, "Go ahead . . . . I know you have to do these things. Be as easy as you can" — "make it as easy as . . . [you can] for Mrs. Noxon." The latter was in the house at the time. The defendant has argued that the admission of that evidence was prejudicial since the jury could infer from it that the police were being asked to make it easy for the defendant because he was guilty and needed assistance. We are of opinion that the jury rightly could only construe the statement in question of the defendant's partner to have been one prompted by natural sympathetic solicitude for Mrs. Noxon, and that there was no prejudicial error in the admission of this evidence.

Assignments of error 33 and 34. These assignments are based on exceptions to the admission in evidence of models of the original trouble cord prepared by the manufacturers. The defendant argues that the models were not similar to the original trouble cord and that they have no connection with the defendant or the crime charged. There was no error in their admission. Their admission rested largely, although not entirely, in the discretion of the trial judge, whose duty it is primarily to determine whether there is sufficient similarity between what is offered and the original which is the subject of inquiry to make that which is offered of assistance to the jury. *Everson* v. *Casualty Co.* 208 Mass. 214, 218–221. The action of the judge cannot be said to have been erroneous.

Assignments of error 35, 36 and 59. Assignments 35 and 36 concern the exceptions of the defendant to the action of the judge in permitting a witness for the Commonwealth to perform experiments by cutting a cord, prepared by the same manufacturers at the request of the Commonwealth, identical with that found in the plug and lamp which had been cut off from the trouble cord destroyed by the defendant, and which had been admitted in evidence, and in allowing the cord experimented upon to be displayed to the jury. There was no error in so doing. "The permission to perform or make experiments or illustrations in the presence

of the jury rested in the sound judicial discretion of the . . . . judge." *Commonwealth* v. *Chin Kee*, 283 Mass. 248, 260, and cases cited. We cannot say as matter of law that the evidence would not justify the judge in concluding that the experiment would be of assistance to the jury in understanding the characteristics of the original trouble cord. *Commonwealth* v. *Buxton*, 205 Mass. 49, 52–53. *Commonwealth* v. *Plissner*, 295 Mass. 457, 461–462. Assignment 59 is based on the defendant's exception to the admission in evidence of a copper print test made by the State chemist for the presence of copper on the back of the metal tray on which the baby was resting when electrocuted. This subject is governed by what we have just said concerning assignments 35 and 36. There was evidence that the ground essential to the transmission of electricity through the body of the baby could have been created by the exposed ground wire coming in contact with the tray, and there was evidence to warrant the jury in finding that this wire did come in contact with the tray. We discover no abuse of the discretion resting in the judge. See *Commonwealth* v. *Tucker*, 189 Mass. 457, 478; *Dow* v. *Bulfinch*, 192 Mass. 281, 285; *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 521–522, and cases cited.

Assignments of error 39, 40 and 41 do not appear to be pertinent to the exceptions upon which these assignments as set forth in the record are said to be based. In the defendant's brief he merely asserts as to these assignments that Chief Sullivan "perjured himself on the stand and admitted it . . . [and] repeated gratuitous assertions and violent accusations, all to the prejudice of the defendant," and, citing *Commonwealth* v. *Gricus*, 317 Mass. 403, asks this court to "read and review carefully" the testimony of Chief Sullivan. We consider that evidence as well as all other evidence in the case under the provisions of G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341.

Assignments of error 47, 106 and 107. By assignment 47 the defendant contends that it was error to permit Dr. Moritz to testify concerning the observations made by him at the autopsy conducted on the body of the baby. The

same issue is raised by assignments 106 and 107 based on the exceptions to the refusal of the judge to instruct the jury not to give consideration to any evidence obtained through the autopsy. The defendant argues that the autopsy was not conducted in compliance with the statute governing autopsies, that hence it was illegal, and that no evidence with respect to it could be admitted rightly. We have already recited the details attendant upon the autopsy. It does not appear, however, that the district attorney or any other public officer authorized the autopsy as required by G. L. (Ter. Ed.) c. 38, § 6, as amended by St. 1939, c. 475. (See now St. 1945, c. 632, § 4.) Nevertheless Dr. Moritz, Dr. Dutra and the medical examiner could testify as medical experts as to what they found on examination of the body and their conclusions as to the cause of death. *Commonwealth* v. *Dunan*, 128 Mass. 422. *Commonwealth* v. *Taylor*, 132 Mass. 261. See *Commonwealth* v. *Wilkins*, 243 Mass. 356. No error is shown by these assignments.

Assignments of error 55 and 61. Assignment 55 relates to the exception to the admission of a question put to Dr. Moritz as to the condition of the model of the original cord when he received it. His answer was that it was "intact." The defendant argues that this evidence was inadmissible because the model had not then been admitted in evidence as an exhibit but had only been marked for identification. The short answer is that this evidence was inconsequential. Assignment 61 concerns an exception to the admission of a spectrograph plate of "control skin" taken from the baby's left arm and an analysis of skin taken from an experimental animal. The judge limited its admission to the extent only that it showed experiments on the "control skin" of the baby. The admission of this evidence rested in the discretion of the judge, which does not appear to have been abused.

Assignments of error 64 and 65. These assignments are based upon exceptions to the admission of questions put to Dr. Helpern, a medical expert for the defendant, as to whether the safety pin concerning which Dr. Helpern had been testifying was said by the defendant's counsel to be like the pin by which the baby's diaper had been fastened

at the time of his death, and whether safety pins of other sizes had been shown to him by counsel for the defendant. The defendant argues that it was prejudicial to him "to imply that a search was made for a safety pin to fit the dumbbell shaped burn on the infant's left forearm," and that the conversations of his counsel with this expert witness were privileged. We know of no such privilege, and *Commonwealth* v. *Best,* 180 Mass. 492, relied upon by the defendant, is not authority for the proposition that it exists. The safety pin in question had been marked for identification at the request of the defendant who asked Dr. Helpern to compare it with the photograph of the dumbbell burn. While this witness was testifying the judge declined to permit the jury to examine the pin and photograph at that time, but stated that the jury could examine them when they retired. It was thus in effect admitted in evidence. The defendant was attempting to prove that the dumbbell burn was caused by a safety pin of the size of that presented by him. It was competent for the Commonwealth to show that no contention was being made that the pin was one of those by which the baby's diaper had been fastened, and that a pin of the size presented was selected after several pins of different sizes had been examined by the witness at the request of the defendant's counsel. The questions excepted to were the proper subject of cross-examination in view of what had been brought out with respect to the same subject matter by the defendant in direct examination. The limits of cross-examination ordinarily rest in the sound discretion of the judge. *Commonwealth* v. *Russ,* 232 Mass. 58, 79. *Commonwealth* v. *Mercier,* 257 Mass. 353, 371–372.

Assignments of error 78 to 86, inclusive. Assignment 78 is based on exceptions to the admission of questions concerning the purchase by the defendant of the extension cord attached by him to the soldering iron; assignment 79 to the admission of questions with respect to the whereabouts of the extension cord and iron on September 25 and 27; assignment 80 to the admission of evidence as to the manufacture of the extension cord and its original length;

and assignment 81 to the admission of the question put to the witness San Giovanni with respect to when he had last seen the soldering iron. This evidence was adduced by the Commonwealth in rebuttal. The defendant contends that the evidence was not true rebuttal and that the soldering iron was never connected with the fatality in any way. We do not concur. The evidence was competent to rebut that of the defendant adduced after the Commonwealth had rested. A party who has rested his case has the right to introduce, later, competent evidence to rebut evidence of new facts appearing on the testimony of witnesses called by the opponent, and a trial judge may also in his discretion admit evidence offered by a party, after he has closed his case, which does not rebut evidence of facts appearing for the first time in the testimony of witnesses called by his opponent, but is material evidence in the case of the party offering the evidence. *Commonwealth* v. *Wood,* 302 Mass. 265, 267–268, and cases cited. The evidence as to the soldering iron, the purchase of the extension cord and its subsequent use, brought out in the defendant's case, was the legitimate subject of rebuttal. We have considered heretofore the admissibility of the soldering iron in evidence. Assignments 82 and 83 concern exceptions to the admission of testimony of Dr. Moritz and Dr. Dutra in rebuttal with respect to whether there was a gap in either of the parallel lines of the dumbbell burn. As part of the defendant's case Dr. Helpern had testified that in his opinion there was a gap in one of those lines connecting the ends of that burn. Assignment 84 concerns the admission of testimony of Dr. Hunt in rebuttal to the effect that a child of the age of the baby who was experiencing pain from a burn on his left arm would not have a natural reflex action which would cause him to attempt to relieve the pain in the left arm by reaching or trying to reach that arm with his right arm. Dr. Helpern, a witness for the defendant, had testified that there would be such a reaction. Assignment 85 is based on exceptions to the admission in rebuttal of an opinion of Dr. Hunt that the length of the forearms of the baby was such that the only way that the burns on both his arms could be

brought together was by crossing his arms and holding them there. This was contrary to evidence adduced by the defendant. What we have said above disposes of assignments 84 and 85. Assignment 86 is directed to the admission in rebuttal of testimony of Dr. Walker concerning the composition of the safety pin to which we have referred hereinbefore. The defendant had produced the safety pin and opened the discussion as to its component parts. It was obviously competent for the Commonwealth to have its experts testify in rebuttal with respect thereto.

Assignments of error 97 to 100, inclusive, and 103 to 105, inclusive.[1] These assignments concern exceptions to the refusal of the judge to instruct the jury in accordance with certain requests of the defendant. Assignment 97 is to the refusal to instruct the jury that "The fact, if it be proved to the jury to be a fact, that the deceased son of the defendant was a Mongolian type does not prove or tend to prove a motive on the part of the father for taking his life." There was evidence that the defendant had stated at different times shortly following the death of the baby, "Of course I have a motive" and "I suppose I could have a motive." The notes which the defendant made that were found in his wastebasket contained the statement "I suppose I had a motive." The judge instructed the jury that motive was no part of the offence charged, that the Commonwealth was not required to prove a motive but that evidence tending to show a motive was always competent, and that, although the crime of murder may be committed without a motive, it never can be committed without an intent, "and as bearing upon the question of intent, motive or absence of motive may present considerations of the utmost importance." The judge further developed the subject of motive with accuracy. These instructions were correct and adequate, and the judge properly left to the jury without specific comment the evidence concerning motive springing from the defendant's own statements. The weight to be given that evidence was for

---

[1] Assignments 94, 95, 96, 101 and 102 were waived.

the jury.  Assignment 98 is based on the refusal of the judge to instruct the jury in accordance with the defendant's request that "The attitude of the defendant toward the deceased during his lifetime is competent evidence for the jury to consider in passing upon the issue as to whether the defendant did in fact take the life of his child."  No error is disclosed.  Evidence was adduced by the Commonwealth from its own witnesses tending to show that the defendant had been a kind and attentive father.  This evidence was competent.  *Commonwealth* v. *Beal*, 314 Mass. 210, 230, and cases cited.  The judge was not required to single it out for comment to the jury, who could give it such weight in the light of the other evidence as they deemed proper.  *Commonwealth* v. *Polian*, 288 Mass. 494, 499.  *Commonwealth* v. *Beal*, 314 Mass. 210, 230.  Assignments 99 and 100 are based on the exceptions to the refusal of the judge to instruct the jury that "The fact that the defendant himself is crippled and has suffered from adversity is no evidence tending to prove that he would be tempted to take the life of his own child" and that "The fact that the defendant himself is crippled and has suffered from adversity is no proof whatsoever that a motive existed for the murder or killing of his child."  The evidence of the defendant's physical difficulties came from his statements and testimony, and is further set forth in his brief.  That the judge was not required to grant these requests for instructions is settled by what we have said just above concerning assignment 98.  Assignments 103 and 104 concern exceptions to the refusal of the judge to instruct the jury (1) that "The Commonwealth having introduced as part of its case statements of the defendant as to happenings, observations and state of mind, and there being no evidence contradicting them, the Commonwealth is bound by those statements, observations and testimony," and (2) that "The mere disbelief of testimony as to a certain fact is not affirmative proof of a contrary fact."  The judge refused to give these requests "in terms."  With respect to the first of these requests there was no error.  It was for the jury to determine the weight to be given to

the statements of the defendant. They were not obliged to accept or reject his statements in their entirety, but could give credence to only such portion as they deemed trustworthy. *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 30. As to the second request, the defendant did not point out any specific testimony to which such an instruction was appropriate or as to which it was needed. Although the requested instruction was correct in law, it was only an abstraction, and the refusal of a request, "even if it embodies correct principles of law, which is not pertinent to any testimony, is not error." *First National Bank* v. *Mathey*, 308 Mass. 108, 115, and cases cited. Assignment 105 relates to an exception to the refusal of the judge to rule substantially as set forth in the request covered by assignment 103, and is governed by what we have just said concerning that assignment.

Assignments of error 108, 109, 110 and 111. These assignments of error are based on exceptions to the denial of four motions for new trial. They were filed on July 7, 1944, July 8, 1944, October 4, 1944, and November 15, 1944, respectively. Assignments 108 and 109. The first motion was as follows: "Now comes the defendant herein and moves the court, after verdict, to set aside said verdict and set a new trial, and assigns as grounds therefor the following: (1) because the verdict was against the law as given to the jury by the court; (2) because the verdict was against the evidence and the weight of the evidence; (3) for any other cause for which by law a new trial may be granted; (4) because justice has not been done herein." The second motion was the same as the first except that the words "grant a new trial" were used instead of the words "set a new trial" in the first motion. There was no error in the denial of these two motions. The question of whether the verdict of guilty of murder in the first degree could have been rendered upon the evidence conformably to the law could have been and was raised at the trial by the defendant's motions for directed verdicts which were denied by the judge, whose action we have sustained in the disposition of the defendant's exception to that action. See *Com-*

*monwealth* v. *Gricus*, 317 Mass. 403, 405, and cases cited. Assignment 110. This assignment concerns the third motion for new trial. This motion was based on allegations that, by reason of the false and malicious statements made concerning the defendant prior to his trial, it was impossible for the court to provide an unprejudiced panel for jury trial, that "by reason of such statements having widespread circulation in Berkshire County, a virulent public opinion, inflamed by passion and prejudice, was created against the defendant, making it impossible to select a jury who would weigh the evidence at the trial impartially and decide the issue fairly," and that "subsequent to the mistrial herein and prior to the commencement of the trial which resulted in defendant's conviction, State officers, at the behest of the district attorney of the western district, interviewed members of the first jury as to their conduct during the period they sat as jurors before the mistrial was declared. Said officers sought to pledge these jurors, or certain of their number, to secrecy in regard to the investigation which was being made. It became public, however, that such investigation was going on and, as a result, the defendant was prejudiced in securing a fair and impartial trial." This motion was accompanied by affidavits of the defendant setting forth alleged false statements made about him prior to his first trial, and also setting forth items published in certain newspapers in Berkshire County following his arrest on September 27, 1943. The motion was also accompanied by affidavits of others to the effect that they had heard certain of the statements referred to in the affidavit of the defendant, as well as other specified statements that reflected upon the moral character of the defendant, and a statement to the effect that the juror whose illness brought about a mistrial at the first trial "had been paid a large sum of money for going through with Noxon." Another affidavit accompanying the motion was that of one Rhoda L. Kolcz, a psychiatric social worker connected with the Northampton State Hospital, setting forth that she had investigated the case of the defendant at the request of Dr. Ball, superintendent of the hospital, to enable him and

the department of mental health to reach a conclusion concerning the sanity or insanity of the defendant, and that she believed that her report, made a part of the affidavit, reflected the attitude of the community toward the defendant and "did so reflect it before his trial." The report contains statements concerning the history of the defendant and many statements of specific misconduct on his part that reflected adversely and most seriously upon his moral character. The report was noted as "strictly confidential and for professional use only." The report is dated February 12, 1944. The report of mental examination of the defendant was filed on February 17, 1944, and the jury in the present case were empanelled on May 31 and June 1, 1944. An affidavit was filed by one of counsel for the defendant setting forth that the report just above mentioned did not come to the "attention of defendant, or his counsel, nor did defendant nor his counsel have any knowledge as to facts therein until about October 1, 1944." This motion for new trial was addressed to the discretion of the judge, and his action must stand unless there was a clear abuse of discretion. *Commonwealth* v. *Cero*, 264 Mass. 264, 274–275. The judge could have found properly that at the inception of the trial the defendant was aware of the newspaper reports that followed his arrest, and the judge was not obliged to believe that the defendant was not aware before the trial began of the gossip and of the matters contained in the Kolcz report of which he now complains. See *Commonwealth* v. *Millen*, 290 Mass. 406, 410. If the defendant was of opinion that he could not obtain a fair and impartial trial in Berkshire County, he should have moved for a change of venue on the ground of local prejudice in the county and community where the case was pending. G. L. (Ter. Ed.) c. 277, § 51. See *Commonwealth* v. *Sheppard*, 313 Mass. 590, 594. And when the jury were empanelled, the defendant should then have raised every question of law which he now undertakes to raise by this motion for new trial. *Commonwealth* v. *Cero*, 264 Mass. 264, 275. A further ground for new trial urged by the defendant is that the amount of time during which

the jury deliberated (about six hours) before returning their verdict was inadequate. This contention is not sustained. The case had been tried fully, and the jury could not help receiving impressions as the case proceeded. The jury were not called upon to spend time in discussing matters upon which they were in agreement. *Commonwealth* v. *Clark*, 292 Mass. 409, 416. The denial of this third motion for new trial cannot be said properly to have been erroneous. Assignment 111. This assignment is concerned with the denial of the defendant's fourth motion for new trial. This motion was accompanied by three affidavits. A fourth affidavit was filed later. In the first affidavit the affiant F. Raymond Greene stated that he had heard juror Chittenden say with reference to the defendant, "if I ever had anything to do with it, I would hang the . . . ," or words to that effect. In the second affidavit the affiant Kenneth S. Raynard recited that he knew juror Chittenden, that he had had various conversations with him, and that he came to the conclusion that Chittenden disliked the defendant. In the third affidavit the affiant George F. New recited that at least a month before the trial of the defendant and before juror Brown knew that he was to serve as a juryman the affiant discussed the case with Brown and that "as best as . . . [he] can remember" Brown said that he "believed that the man was guilty." In the fourth affidavit the recitals of the affiant Leon Chesebro concerning alleged statements of Chittenden were substantially the same as in the first and third affidavits. The defendant and his counsel filed an affidavit to the effect that they had no information as to facts set forth in the affidavits of Greene, Raynard and New until "recently, and long after the verdict of the jury." Jurors Chittenden and Brown made counter affidavits to the effect that they had no recollection of ever making the statements attributed to them in the affidavits before referred to. The motion was heard on the affidavits and the oral testimony of the affiants Greene, Chesebro and Raynard, and the judge took notice of the testimony of jurors Brown and Chittenden at the preliminary examination at the trial as to their qualifications to sit as

jurors. In denying the motion under consideration the judge filed findings and rulings, and while stating that he was not required to make findings of fact (see *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 25, 26), he did make such findings in which he found that the defendant had not established by a fair preponderance of the evidence any of the material allegations of the motion for new trial; that the affiants Greene, Raynard, Chesebro and New did not have any direct conversations with either of the jurors Chittenden or Brown, before they were drawn on the jury, in which either of them gave utterance to any opinion, expressly or by implication, as to the guilt of the defendant; that Chittenden and Brown did not give utterance to any opinion, expressly or by implication, before they were drawn on the jury, as to the guilt of the defendant in conversations with their fellow workers or the affiants; and that Chittenden undoubtedly discussed the case before he was drawn as a juror and was overheard to express his opinion as to what the penalty would be if the defendant was found guilty. The judge further found that "(a) Any statements in the affidavits filed in support of the defendant's motion for new trial (filed November 15, 1944) inconsistent with my findings in the foregoing paragraph are not true. (b) Jurors Chittenden and Brown were not biased, prejudiced or hostile toward the defendant. (c) Jurors Chittenden and Brown when examined by the court on the voir dire were frank and honest and told the truth in their answers to the court in relation to consciousness of bias or prejudice, and in relation to all matters concerning which the court examined them." The credibility of the affiants and the truth or falsity of the statements set forth in the affidavits presented questions of fact upon which the determination of the judge was final. He was not required to believe the affidavits or the oral testimony. *Commonwealth* v. *Crapo*, 212 Mass. 209, 210. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 25–26. *Commonwealth* v. *Millen*, 290 Mass. 406, 410, and cases cited. *Boston* v. *Santosuosso*, 307 Mass. 302, 353. The denial of this fourth motion for new trial cannot be said rightly to have been erroneous.

We have disposed above of all the defendant's assignments of error that have been argued, and discover no error with respect to any of them. We have also examined those that have not been argued and find that no error is shown thereby.

In accordance with the mandate of G. L. (Ter. Ed.) c. 278, § 33E, amended by St. 1939, c. 341, we have examined the whole case and are satisfied that justice does not require a new trial for any reason.

*Judgment affirmed.*